## COMMONWEALTH v. JOSEPH NICELY ET AL.

### APPEAL BY DEFENDANTS FROM THE COURT OF OYER AND TERMINER OF SOMERSET COUNTY.

Argued October 14, 1889—Decided November 11, 1889.
[To be reported.]

1. The district attorney is a quasi judicial officer, representing the commonwealth, which seeks no victims: it is as much his duty, therefore, to see that no innocent man suffers, as it is to see that no guilty man escapes.

2. When the district attorney permits private counsel to assist him in the trial of a cause, such counsel represents him to that extent, and should be governed in his conduct of the case by the same rules of propriety.

3. There is no way provided by which objectionable remarks by counsel in an argument to the jury may be brought upon the record, and errors assigned, upon which the judgment of the court may be reversed by reason thereof.

4. If, on the trial of an indictment for murder, the jury render a verdict of guilty, without specifying the degree of murder, it is not error, before the verdict is recorded and the jury separated, to send the jury back to amend their verdict.

(*a*) On the trial of an indictment, a witness, being asked by the commonwealth if a pocket-book was given her by a certain person at a certain time, replied affirmatively and stated that the same pocket-book had been handed to the officers in her presence.

5. In such case, it was not error to refuse to permit the defendant, producing a pocket-book, to interrogate the witness as to its indentity with the pocket-book handed to the officers, and to test the witness's knowledge in regard to the same.

Before Paxson, C. J., Sterrett, Green, Clark, Williams, McCollum and Mitchell, JJ.

No. 196 October Term 1889, Sup. Ct.; court below, No. 2 May Term 1889, O. & T.

On May 28, 1889, the grand jury returned as a true bill an indictment charging Joseph Nicely and David Nicely with the murder of Herman Umberger. On May 30th, the prisoners being formally arraigned, pleaded not guilty.

The indictment was called for trial on May 31, 1889, when the case shown, so far as material to this report, was as follows:

Statement of Facts.

Herman Umberger, the deceased, was a farmer living in Jenner township.  On Wedesday evening, February 27, 1889, he and his wife Nancy, Ellen Stern, a hired girl, and a little girl named Nannie Horner, were seated in the sitting-room.  About 7 o'clock, a rap was heard at the door, and Mr. Umberger said, come in, when the door opened and two men entered, and upon invitation seated themselves at the stove.  After a short time one of the men said they were officers from Bedford county, were authorized to search for jewelry that had been stolen from a peddler, and to search every house between Jennertown and Johnstown.  Being asked if they had a warrant, they produced and read a paper which they said was a warrant.  They then proceeded to search the house, without opposition.  Mr. Umberger, the two men and Nannie Horner went into the bedroom, when one of the men insisted on the opening of the upper drawer of the bureau.  This exposed the contents of the second drawer, among which were two pocket-books, which Mr. Umberger said contained some money with which to pay his hands, and which he picked up and put in his vest pocket, having no coat on.  He then told the little girl to go and ask Mrs. Umberger to come in.  She came in and said, "this thing has gone far enough."  They all then went toward the sitting-room, and as they entered it, one of the men presented a pistol at Mr. Umberger, and said, "your money or your life."  Ella Stern ran out on the porch, when she heard a shot fired, and ran to a neighbor's house, returning in about half an hour.  Mrs. Umberger ran into the kitchen and began to ring the farm bell, the rope of which entered the kitchen.  Several shots were fired, and Mr. Umberger came out of the sitting-room into the kitchen and fell upon the floor, dead.  The pocket-books had been taken from him, and they contained over $16,000 in money.

On the Monday following, March 4, 1889, Joseph and David Nicely, the prisoners, were arrested at their homes in Ligonier township, Westmoreland county, about fifteen miles from Mr. Umberger's, over the Laurel Hill mountain.  In their possession, or about them when arrested, were found numerous articles of clothing, etc., which were identified as having been worn by the men who committed the murder.  Pistol cartridges of a like calibre with some of those fired at Mr. Umberger were also found in the possession of one of them.  The prisoners were

taken to the National Hotel, in Ligonier, where they were kept over night. On the way over to Somerset the next day, David Nicely handed a pocket-book to the driver, William Thomas, while the arresting officers were for the moment out of the carriage, and told him to hand it to Watson Menoher, Nicely's brother-in-law, and to tell him to give it to his wife, or to Nicely's father, A. A. Nicely. Thomas afterwards handed the pocket-book to Menoher, who gave it to his wife. This pocket-book having been obtained by the commonwealth, witnesses testified that it was one of the pocket-books belonging to Mr. Umberger.

After a great deal of testimony tending to identify the prisoners with the murder of Mr. Umberger, Mrs. Ella Menoher was called by the commonwealth, and testified that she was the wife of Watson Menoher, and the sister of the prisoners; that the week of March 4th, her husband gave her a pocket-book; that she laid it on the table and was present when the officers came for it and took it away—her mother gave it to them; it was the same pocket-book her husband gave her.

Cross-examined : (A pocket-book shown witness)—Q. Is this the same pocket-book you received from your husband? On objection, the offer was put in writing :

Witness having testified that her husband gave her a pocket-book, and that the witness gave the same pocket-book to her mother, or some other member of the family, and that the same pocket-book was afterwards handed to the officers by the mother of the witness in her presence, and the commonwealth having offered evidence to prove that the pocket-book received by the officers was the pocket-book of Herman Umberger, and a pocket-book having been exhibited to a number of witnesses called by the commonwealth, in the presence of the jury, counsel for the defendants now ask that the pocket-book be shown to the witness in order that she may be interrogated as to its identity, and to test the knowledge of the witness in regard to the same.

To this the commonwealth objects : The witness was called to trace a pocket-book, but not to identify anything. The witness is a sister of both defendants, as she has sworn, and the commonwealth does not expect her to identify the pocket-book,

but expects to prove identity by other witnesses. Not having asked witness a word about identity, the commonwealth is unwilling to have her appear before the jury as its witness on the subject of identity.

By the court: In our opinion, it is evidence in chief on part of the defence, but not on cross-examination, and the question is therefore excluded; bill sealed.to the defendants.[2]

The defendants offered testimony to meet that offered by the commonwealth, and to sustain the substantive defence of alibi.

The district attorney was assisted in the trial by private counsel; and, at the close of the testimony on both sides, the defendant's counsel moved the court that the district attorney make the concluding argument to the jury. The court ruled, that, as the district attorney had waived his right, " the private counsel, representing him in the closing argument, must be bound by the same rules as a quasi judicial officer, and, as such, can press for a conviction, but no further than the district attorney."

The arguments to the jury having been concluded, the court, BAER, P. J., was about to proceed to deliver the charge, when the court was asked by the prisoners' attorneys to rule upon certain remarks which had been made by counsel, in the concluding argument to the jury, and which were alleged to be " unwarranted by the testimony and the law." The remarks complained of had been taken down, and, numbered consecutively, were thirty-five in number. Certain ones, with the rulings upon them, made as instructions to the jury, were the following:

2. " This trial will go very far to show whether every merchant or mechanic is to be safe from masked villains."

By the court: This flight of oratory must not have any effect upon the jury; exception.[8]

35. " There has been false swearing on one side or the other of this case. When you have found out on which side the false swearing has been done, you will have banished the last shade of the last glimmer of the last shadow of a doubt."

By the court: Mr. Cessna always makes that remark in criminal cases. In view of the remarks made by adverse counsel,

this needs no correction. We doubt if it could have affected the jury one way or the other; exception.[13]

The court then charged the jury, instructing them upon the law of murder and manslaughter, in the various degrees, and reviewing at length the testimony in the case, when the jury retired.

The next morning, June 8th, the jury came into the court-room, the prisoners being present. The clerk, having received a paper from the jury, said: "Gentlemen of the jury, hearken to your verdict as the court records it. In the case of the Commonwealth against Joseph Nicely and David Nicely, you say you find the defendants, Joseph Nicely and David Nicely, guilty, in manner and form as they stand indicted, and so say you all?" The jury: "Yes, sir."

By the court: You do not say what you have found the defendants guilty of. Go back to your room, and say specifically what you find them guilty of.

Prisoners' counsel: We object; the verdict has been taken.

By the court: It has not yet been recorded. (Remark by juror not caught by reporter.) The jury say they did not understand the charge as to the form of the verdict. (To the jury:) The jury having said that they did not fully understand the charge as to the form of the verdict, they are now re-charged as to the request, in the presence of the prisoners and before the recording of the verdict which they returned and which was in this form: "We find the defendants, Joseph and David Nicely, guilty in manner and form as they stand indicted;"—we charged you, that if the jury find that the crime of murder was committed, the jury must by their verdict say whether it be guilty of murder in the first degree, or murder in the second degree. Exception.[27]

The jury returned a second time, finding the prisoners guilty of murder in the first degree. The jury were then polled. A rule for a new trial having been discharged, on August 19, 1889, on motion of the district attorney, judgment according to law was passed. Thereupon the prisoners took this appeal, specifying that the court erred, inter alia:

2. In refusing the prisoners' offer.[2]

8, 13. In ruling on the prisoners' exceptions.[8] [13]

27. In re-charging the jury after their verdict.[27]

*Mr. Wm. H. Koontz* and *Mr. A. H. Coffroth* (with them *Mr. W. H. Ruppel*), for the appellants:

1. Was the offer of the defendants proper in cross-examination of Mrs. Menoher? In England, counsel, in cross-examination in important cases, are permitted to ask questions bearing on the whole case, so as to bring out matters of independent moment: Morgan v. Brydges, 2 Stark. 314. Calling a witness for a mere formal purpose, e. g., proving a paper, opens him to cross-examination as to the whole case: Blackinton v. Johnson, 126 Mass. 21; Fulton Bank v. Stafford, 2 Wend. 483; Page v. Kunkey, 6 Mo. 433; Aiken v. Cata, 23 Ga. 154. All the facts and circumstances connected with the matter of the direct examination may be inquired into upon cross-examination: Savage v. State, 18 Fla. 909; State v. McNinch, 12 S. C. 89; People v. Oyer and Terminer, 83 N. Y. 436; Hoffman v. Strohecker, 7 W. 86; Jackson v. Litch, 62 Pa. 456; Moody v. Rowell, 17 Pick. 490; Beal v. Nichols, 2 Gray 262; Linsley v. Lovely, 26 Vt. 123; Markley v. Swartzlander, 8 W. & S. 172; Covanhovan v. Hart, 21 Pa. 495; Egbert v. Egbert, 78 Pa. 328; Bank v. Fordyce, 9 Pa. 276; Rhodes v. Commonwealth, 48 Pa. 397.

2. "There can be nothing gained in the end by an overzealous and unfair perversion of facts in order to convict an accused person of a crime of which the prosecutor may have good reasons to believe him guilty; . . . . . While the zeal of the prosecutor may be well excused; and the hot and bitter language that comes from the heart, involuntarily, of one who is thoroughly impressed with the heinousness of the crime and the guilt of the respondent, is to be expected in such cases, it is nevertheless the duty of the court, sitting impartially between the people and the prisoner, to check and control any intemperance of zeal or language, that is not warranted by the facts and circumstances shown by the proof. If this is not done, as it was not in this case, the final court of review, removed entirely from the passion and prejudice that generally surrounds the trial in the lower courts, of cases of this nature, will see to it that the injustice is corrected and a new trial granted:" MORSE, J., in Michigan v. Aiken, 10 W. R. 547.

3. We claim that there are two verdicts in this case, and if

either is to stand it must be the first one. It was taken in the precise form that all verdicts are taken in the criminal courts of Somerset county. " The jury, when they have agreed, signify the fact by the foreman, and the clerk, directing the defendant to stand up or to lift up his hand, addresses the jury and the defendant as follows: ' Prisoner, look on the jury ; jury, look on the prisoner : How say ye ; is the prisoner guilty of the felony whereof he stands indicted, or not guilty ? ' The foreman, if there be a special verdict, reads it, or if the verdict be general, states it, guilty or not guilty, as the case may be. The clerk then records the verdict and again addresses the jury : ' Hearken to your verdict as the court hath recorded it : you say that A B is guilty (or not guilty) of the felony whereof he stands indicted, and so you say all ? ' This last declaration of the clerk is important, as fixing the character of the verdict and preventing misconception : " Wharton, Crim. Pl. & Pr., 9th ed., § 747.

*Mr. F. W. Biesecker*, District Attorney, and *Mr. F. J. Kooser* (with them *Mr. John Cessna* and *Mr. S. U. Trent*), for the commonwealth :

1. A party, before he has opened his case, cannot introduce it to the jury, by cross-examining the witnesses of the adverse party : Ellmaker v. Buckley, 16 S. & R. 72 ; Castor v. Bavington, 2 W. & S. 505 : Turner v. Reynolds, 23 Pa. 199 ; Breinig v. Meitzler, 23 Pa. 156 ; Helser v. McGrath, 52 Pa. 531 ; Jackson v. Litch, 62 Pa. 451 ; Wharton on Ev., § 529 ; Floyd v. Bovard, 6 W. & S. 75. Had the cross-examination been permitted as asked, part of the defence would have gone in then, and the remainder on the same question would necessarily have been withheld until the witnesses for the commonwealth had been called, greatly interfering with the orderly procedure, and " entangling the justice " of the case.

2. None of the remarks of counsel to the jury were of such a character as would warrant a new trial, much less a reversal of the judgment. " Apart from the fact that counsel for the prisoners had the right at any time to call the court's attention to any improper argument or remark, and to request the court to direct the jury to take no notice of it, and that a party cannot take his chance of a verdict and hold in reserve a motion for

new trial, how could it be possible ever to try and successfully convict a prisoner charged with murder if, during the trial, the commonwealth's counsel, or even the prisoner's, should, in the heat of argument, refer to something which indirectly and by some possibility might affect the prisoner's case ? " Commonwealth v. Hanlon, 8 Phila. 423.   Indulgence is extended to extravagant declaration, and prejudicial remarks are not sufficient for reversal: Thompson on Trials, §§ 978–9, 985.  If counsel misstate the testimony, the court below, if the purpose of justice require it, may set aside the verdict and grant a new trial; their refusal to do so is not subject to review on writ of error: Thompson v. Barkley, 27 Pa. 263.

3. Section 74, act of March 31, 1860, P. L. 402, provides as to the verdict that " the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or second degree."   The jury had not only rendered no verdict, under the facts shown, but they had not rendered and were not yet prepared to render a verdict under the law. " Until a jury are discharged, the verdict may be amended. After they are discharged and separate, however, it is too late. And if there is any informality, uncertainty, or impropriety about a verdict, the court may require the jury to amend it before they separate.   Even when a verdict of 'not guilty' was pronounced by one of the jurors, which was entered by the clerk in the minute book, and the prisoner discharged, it was held that upon it appearing that the verdict intended was 'guilty,' the record could be immediately amended, the verdict 'guilty' recorded, and the prisoner committed:" Wharton, Crim. Pl. & Pr., 8th ed., § 751.

OPINION, MR. CHIEF JUSTICE PAXSON:

But few of the numerous specifications of error in this case require notice; none of them needs extended discussion.

The defendants below were indicted for homicide, and were convicted of murder in the first degree.   At the trial of the cause the district attorney appears to have been aided by private counsel, and the defendants complain that in many instances things were said by counsel for the commonwealth, either directly to the jury or in their presence and hearing, which were not war-

ranted by the evidence, or which were unfair comments upon it. While the matter has been brought upon the record by exceptions, we have only isolated passages extracted from the remarks of counsel, generally three or four lines; and we can but imperfectly judge of their character and propriety, nor can we tell how they may have been qualified by what preceded or followed them. I am not aware of any way by which the speeches of counsel can legally be placed on the record, nor do I well see how the judgment of the court could be reversed by reason of their remarks. I would regard any system of practice by which error could be assigned to the summing up of counsel as a very great calamity. In the instances complained of, the record shows that whenever the attention of the court was called to them the learned judge treated them as harmless, and directed the jury to pay no regard to them. As an illustration, I refer to the eighth specification. It is as follows:

8. The court erred in its answer to the second exception of defendants to the remarks of the counsel for the commonwealth to the jury, which said exception and answer are as follows:

" This trial will go very far to show whether every merchant or mechanic is to be safe from masked villains."

By the court: This flight of oratory must not have any effect upon the jury.

I also refer to the thirteenth specification:

13. The court erred in its answer to the thirty-fifth exception of defendants to the remarks of the counsel for the commonwealth to the jury, which said exception and answer are as follows:

" There has been false swearing on one side or the other of this case. When you have found out on which side the false swearing has been done, you will have banished the last shade of the last glimmer of the last shadow of a doubt."

By the court: Mr. Cessna always makes that remark in criminal cases. In view of remarks made by adverse counsel, this needs no correction. We doubt if it could have affected the jury one way or another.

These are fair examples of this class of specifications. While they do not furnish any legal grounds for the reversal of the judgment, they are suggestive of a heated zeal on the part of counsel engaged on either side in the trial of the cause. It is

difficult to measure the amount of zeal which is allowable, or at least excusable, on the part of counsel engaged in the defence of a man who is upon trial for his life. Writers upon professional ethics differ upon this subject, and I will not discuss it. We have no difficulty, however, in measuring the extent of zeal which counsel for the commonwealth may properly display upon such occasions. The district attorney is a quasi judicial officer. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan. When that officer allows private counsel to assist him in the trial of a cause, such counsel represents him to that extent, and should be governed by the same rules of propriety.

Upon the argument of this case at bar, much stress was laid upon the second specification, which alleges that the court below erred in excluding the cross-examination of Ella Menoher in regard to the pocket-book. To understand this point, it is necessary to state that when the deceased, Herman Umberger, was murdered in his own house, on the evening of February 27, 1889, two pocket-books were taken from his person, containing upwards of $16,000 in money. The commonwealth had offered evidence to prove that David Nicely, one of the defendants, had, on the day of his arrest, while being conveyed to Somerset county, and when no one else was present, given a pocket-book to William Thomas, the driver of the carriage; that Thomas gave the same pocket-book to Nicely's brother-in-law, Menoher; that Menoher had given the same pocket-book to his wife, a sister of defendants, the witness on the stand. The latter testified that her husband gave her a pocket-book after the defendants were arrested; that she laid it upon a table; that her mother gave it to the officers; and that it was the same pocket-book she had received from her husband. At this point the defendants' counsel interposed the cross-exami-

nation referred to, the object of which was to interrogate the witness as to the identity of the pocket-book. But the commonwealth had not asked her a question as to its identity. They did not call her for any such purpose. On the contrary, she was only asked to trace the book; in other words, to show that the book which was given to the officers in her presence was the same book which she had received from her husband. The commonwealth expected to prove the identity of the book by independent evidence. The witness on the stand was a sister of the defendants, and the commonwealth very properly declined to allow the defendants to inject their defence into the case at this stage by a witness who might fairly be presumed to be favorable to the defence, but which the commonwealth was compelled to call. The court below committed no error in holding that this was not proper cross-examination. The pocket-book was sufficiently identified as the property of the deceased, and was properly admitted in evidence.

It was also alleged that the court below erred in receiving and recording the verdict. What occurred in regard to this matter may be briefly stated as follows : The jury came in with a verdict of "guilty in manner and form as they stand indicted." In this there was no finding of the degree of murder, as required by the act of assembly. Before the verdict was actually recorded, and before the jury had left the box, the court sent them back to their room, with instructions to find the degree. They returned into court, and rendered a verdict of "guilty of murder in the first degree." Upon being polled, each juror rendered the same verdict, which was then duly recorded, and the jury discharged. We see no error in this. The verdict as first returned was not a compliance with the act of assembly, and the learned judge was entirely right in sending the jury back to amend it. He would have failed in his duty, had he not done so. The allegation that there was nothing to amend by is plausible, but unsound. There was the act of assembly to amend it by. Had the verdict been recorded, and the jury discharged when they first came in, we would have had a different question before us. We might in such case be constrained to hold, under the authority of Johnson v. Commonwealth, 24 Pa. 386, that the verdict as originally rendered was a verdict of guilty of murder in the second degree

only. But there is neither reason nor authority for holding that, where a jury comes in with a defective verdict, the court may not send them out again to amend it. Authorities are abundant upon this point, but it would be a waste of time to cite them. The time has gone by for a convicted murderer to escape upon such a bald technicality. This harmless blunder of a perhaps inexperienced jury did the defendants no injury. There was a time in the history of the English criminal law when great crimes were left unpunished, because of harmless, technical errors. This greater strictness was perhaps due to the fact that at that period the criminal code was especially bloody. Capital punishment was inflicted for very trifling offences; and, it may be, the judges sought to ameliorate its rigor by holding the crown to the observance of the nicest technicalities. We all know that Lord Hale deplored these legal niceties—or quibbles, we may rather call them—as tending to allow many rogues to escape from punishment for serious crimes. With the advancement of judicial science, and a more enlightened administration of the law, mere technicalities are less regarded, where they work no harm to a defendant.

We have carefully examined all of the remaining assignments and find no error.

> The judgment is affirmed; and it is ordered that the record be remitted to the court below, for the purposes of execution.