Commonwealth *v.* Ragone, Appellant.

114

Argued November 26, 1934. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*John V. Diggins,* with him *Ellwood J. Turner,* for appellant.

*William B. McClenachan, Jr.,* First Assistant District Attorney, with him *William J. MacCarter, Jr.,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, January 7, 1935:

There are twenty-three assignments of error before us but the central or planetary error to which all the others are merely satellitesimal is that a youth admittedly insane was forced to go through the travesty of a trial. The "trial" of one in the mental condition of the defendant irresistibly invites that characterization.

On or about June 23, 1933, William Reilly, a boy nine years of age, was murdered in Delaware County. He had been stabbed several times in the abdomen with an ice pick. Richard Ragone, the appellant, who was at the time four months under seventeen years of age,

was charged with the crime and made admissions as to his guilt. Without these admissions the Commonwealth would have had practically no case against the prisoner. (Defendant's counsel contend that because of Ragone's mental condition, his admissions were incompetent, but this question it is not necessary for us now to discuss or decide.)

On September 1, 1933, the prison warden filed a petition averring his belief that Ragone was insane and should be cared for in a hospital for mental diseases. He prayed the court "to order an inquiry into the prisoner's condition," etc. The defendant's counsel asked that the commission be dissolved and the petition dismissed on the ground that its purpose was to deny the defendant a trial. The court held that "to permit this defendant to be committed to a hospital for the criminal insane without a trial on the charge under which he was committed to prison, would be unfair and unjust." On October 9th, defendant was arraigned. The plea entered in his behalf was: "Not guilty by reason of insanity." The case was called for trial on October 9th. Thereupon the defendant's counsel made the following statement to the court: "The psychologists and neurologists, both those for the Commonwealth and those for the defense, are agreed, after examinations of the defendant, that he *is insane* and does not know the difference between right and wrong, and he *was so afflicted at the time of the commission of the crime.* We have suggested that our thought about the manner in which the trial should be conducted was to present the evidence in the regular way, the confessions and statements of the boy, and things of that kind, with the understanding that all the medical testimony would go on the record, and *the Commonwealth will agree that a verdict of not guilty by reason of insanity may be ultimately directed."* The court asked: *"The Commonwealth is willing to do that?"* The assistant district attorney answered: *"Yes, sir."* The court said: "Go on the record as an agreement

under instructions of the court?" The assistant district attorney answered: "Yes." The court said: ". . . *The Commonwealth is not really opposing the plea of insanity?"* The assistant district attorney said: *"No. Our neurologists support that theory."* (Italics ours.)

After some further and immaterial discussion the court said: "Proceed to arraign the defendant." This was done and his counsel entered a plea of "Not Guilty." A short time later the court said: "Gentlemen, so there will not be any misunderstanding of the matter, the nature of the defense, as I understand it, is insanity." The defendant's counsel replied: "Not guilty on the grounds of insanity." A jury was impaneled and sworn. Counsel for appellant claim that had they not relied on the stipulation that a verdict of not guilty would be directed at the close of the trial they would have taken more care in the selection of jurors. The Commonwealth proceeded to prove the corpus delicti and offered in evidence admissions of guilt on the part of Ragone and also an incriminating statement in writing, which it is claimed he voluntarily made and signed. The defense offered the testimony of three physicians who qualified as experts on clinical neurology. The first of these witnesses was a psychiatrist of standing whom the district attorney had employed to examine Ragone a few days after the latter's arrest and who after making a thorough examination reported that the defendant had dementia præcox and that he was "irresponsible" and "not legally accountable for his acts." At the trial the district attorney stated: "We subpœnaed Dr. Wilson. If the defense wants to call him that is satisfactory to the Commonwealth." The defense then did so. He testified that he examined the defendant on the 26th and 29th of June, 1933, and "found him to be what I consider a rather pronounced mental defective; it was a case of dementia præcox which had developed in a boy mentally defective and also with an organic brain disease." He characterized this dementia præcox as "ado-

lescent insanity." He averred that the defendant did not know the difference between right and wrong. The second witness to qualify as a psychologist and neurologist declared the defendant to be "mentally defective, below grade, very unstable, with very little comprehension, very little judgment, very little discrimination, and although he says he knows right from wrong I do not think he really does and in asking him many questions we found he did not seem to know it was wrong to kill." This expert had also examined Ragone on the 3d of December, 1928, five years before the trial. The boy had then been sent to him for mental examination by one of the judges of the Municipal Court of Philadelphia. At that time he said he reached the conclusion that the boy "was mentally defective, psycho-neurotic," and he recommended he "be placed in an institution for the feeble-minded." This same witness on the 9th of December, 1933, ten days before the trial, again "reached the conclusion that he [Ragone] was more feeble-minded than he had been when I saw him before." The clinical psychologist for the Sleighton Farms School for Girls and Friends School in Philadelphia, testified that she examined Ragone on September 29, 1933, and found that, although "his chronological age was sixteen years and eleven months, his mental age was eight years and two months." She said her conclusion from the tests was "that the boy is mentally defective, of low grade, very little judgment, limited comprehension and only appreciable at the simplest types of manual tests. . . . His mental equipment is so constituted that he is unable to make a distinction between right and wrong." All this testimony was uncontradicted and no attempt was made to cast doubt upon it by cross-examination.

This medical testimony furnished ample warrant for the acquiescence of the district attorney in the pretrial statement of defendant's counsel that the Commonwealth and he agreed that defendant was insane then

and at the time of the commission of the crime charged and warranted the directed verdict of "Not guilty by reason of insanity" which the Commonwealth had at the beginning of the trial stated it was "willing" should be returned. No bad faith is anywhere imputed to the district attorney in agreeing that the defendant was insane and if such charge had been made, the undisputed testimony would have dispelled it.

That the district attorney acted within the scope of his official authority in committing the Commonwealth to the proposition that the defendant was insane is nowhere challenged. Such a challenge could not be sustained, in the absence of any proof or imputation of bad faith or improper conduct on the part of the Commonwealth's representative.[1]

As the case therefore stood at the beginning of the trial, there was a record showing that both the Commonwealth's and the defendant's respective representatives agreed, in the utmost good faith and acting upon knowl-

---

[1] "The functions now exercised by prosecuting attorneys were originally performed by the attorney general and such deputies as he might appoint": 18 C. J., page 1296, section 2. Blackstone says of the attorney general: "He was his majesty's counsel learned in the law" (3 Blackstone, section 27). The district attorney "is vested at common law with the responsibility of determining whether or not a criminal accusation should be pressed to trial, and is expected to be impartial in abstaining from prosecuting, as well as in prosecuting. . . . While a case is under the control of the prosecuting attorney any agreement he may make with reference to the disposition thereof is binding so far as it is proper and legal": 18 C. J., pages 1314-15, section 42.

In Com. v. Nicely, 130 Pa. 261, 270, 18 A. 737, this court characterized a district attorney as "a quasi judicial officer." We there said: "He represents the Commonwealth, and the Commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes." In Com. v. Bubnis, 197 Pa. 542, 47 A. 748, this court said of the district attorney: He is "clothed with the gravest responsibilities, and exercises functions in a measure judicial."

edge, that the defendant was insane *then and at the time of the commission of the crime.* This eliminated any issue as to the prisoner's insanity, and it became the trial judge's duty to declare that no trial on the indictment could be then had and to proceed according to law to have the prisoner committed to a proper institution. Nevertheless the court ordered the defendant to trial, later refused the motion for a directed verdict of "not guilty on the ground of insanity," and charged the jury at great length, saying, inter alia: "Don't you think from all the evidence—it is for you to use your judgment uninfluenced by anything that we suggest— that that makes out a crime of murder in the first degree? Because there was a wilfulness; there was the deliberate element to be considered, as well as premeditation? . . . You can in this case, under the evidence, render a verdict of guilty of murder in the first degree and recommend life imprisonment, rather than the death penalty, because of the nature of the testimony as adduced by the defense, the character of the testimony of the doctors and the parents which would appeal to you as good sensible men, endeavoring to see that justice is done as between the Commonwealth and the defendant, that there are such mitigating circumstances in this case as far as the young man is concerned that you would not want to suggest the death penalty, but that it should be life imprisonment, and he would be thus confined, so that, as one of the doctors for the defendant testified that he believed that his disease is progressive and if released at any time he would be a menace to society. If the recommendation of the jury is life imprisonment he would not be a menace to society because he would be sentenced for life, and what his mental condition may be after such a sentence, the law has made provision for just such cases. . . . It may be that you will infer that he is subnormal, feeble-minded, whether it be an affliction caused by something after birth or hereditary is for you to decide, but that he was not of

such an unsound mind at the time of the commission of this offense that he could not distinguish between right and wrong as the law requires. . . . I have suggested to you that if you get to that point [i. e., to the fixing of the penalty after finding him guilty of murder in the first degree], I want to make a suggestion and feel that you might say that it is to be life imprisonment because it may be that you would feel under all the circumstances, in considering all the evidence in the case, both sides, and the doctors' testimony, that the boy's mind was not altogether normal, although he may not have been of unsound mind, and he knew from the legal standpoint as distinguished from the medical standpoint, knew the difference between right and wrong, and he knew the consequence of his act, but it may be that because of his past history, and the kind of a boy he is, that you will feel like recommending life imprisonment rather than his life should be taken." After this charge which, with other parts not herein quoted, indicates that the trial judge in spite of the conclusive proof of defendant's unsoundness of mind, wanted him convicted (but not executed), the jury returned a verdict of guilty of murder in the first degree and fixed the penalty at life imprisonment. Motions in proper form for arrest of judgment and for a new trial were made. The court overruled both motions.[2] In spite of the fact that the trial judge in his opinion[3] which accompanied

---

[2] The order Judge MacDade filed reads as follows: "And, now, the 5th day of March, Anno Domini, 1934, the above matters of motions for judgment non obstante veredicto [sic] and for a new trial coming on to be heard by the court en banc, together with oral arguments and briefs, after due consideration thereof, the court doth order and decree that:

"(1) The motion for judgment 'non obstante veredicto' [sic] be and is hereby refused; and

"(2) The motion for a new trial be and is hereby discharged sec. reg. et sec. leg."

[3] It appears that the opinion filed in this case which preceded the order above quoted was the opinion only of Judge MacDade and that

the denial of these motions characterized defendant's counsel's questioning of the fairness of the trial as "a little mouse of thought which went scampering across distinguished counsel's mind and hopped into its hole again" and said further: "The verdict rings true and in all good conscience will carry on," he proceeded to commit the defendant (whose conviction of murder he had just upheld) to an insane asylum. On April 24, 1934, he handed down the following orders: " . . . that in pursuance to the Act of Assembly of May 2, 1933, P. L. 224, 'providing for the deferring of sentences in certain cases pending the mental examination of defendants; authorizing trial judges to require psychiatrists . . . to examine certain such defendants . . . ; providing for the commitment of defendants to certain institutions where the reports show the same to be advisable; . . . ' a mental examination (subsequent to the said verdict) of this defendant by a psychiatrist from the Norristown State Hospital for Mental Diseases having been made at the direction of this court (see report filed), and as a result of which examination the recommendation of the said psychiatrist was that the said defendant should not be at large and was a menace to society, as the disease with which he was afflicted was progressive, that he should be committed by the court to an institution for mental diseases inasmuch as the defendant was mentally ill and mentally deficient and it was advisable for the welfare of the defendant and the protection of the community that he, the said Richard Ragone, should be committed to some institution other than the county prison, work-house or a penitentiary, the said Richard Ragone, by virtue of the power invested in the court as aforesaid, be and is hereby committed to the care and custody of the Board of Trustees of Farview State Hospital, being a state institution providing for the reception, care, treatment

neither of the other two judges of the court below concurred in the opinion or dissented from it.

and maintenance of persons similarly afflicted as this defendant, in lieu of a sentence to the county jail or penitentiary, and there to be detained until further orders of this court."

Defendant's counsel stated to the court: "Your honor is avoiding entering judgment." The court replied: "Under the Act of 1933, that applies at all times, but you never could see it." The Court: " . . . Justice will be done." Counsel: "Justice would be done the other way. He would arrive at the same place under the same sentence, with all his legal rights protected." The Court: "You tell that to the appellate court."

We cannot understand how the judge reached the conclusion he did in his opinion of December 13, 1933, suspending the proceedings asked for by the warden of the Delaware County jail, in holding that "To permit the defendant in this case to be committed to a hospital for criminal insane, if the commission should find, and the court approve, that he is of unsound mine or insane, would be a denial of his state and federal constitutional rights" (quoting article I, section 6 of the state constitutional provision that "trial by jury shall be as heretofore," and article I, section 9 to the effect that an accused "cannot be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land"). The judge further declared that "to permit the defendant in this case to be committed to a hospital for criminal insane, if the commission should find, and the court approve, that he is of unsound mind or insane, would be a denial of his statutory defenses, to wit, the Act of 1860, paragraph 66" (19 P. S., section 1351). This paragraph of the Act of 1860 provides in substance simply that when a person is charged with a crime and tried and *evidence is given that he was insane at the time of the commission of such offense, and he is acquitted,* the jury is required to find specially whether such person was insane at the time of the commission of the offense, and to *declare whether he was acquitted by them*

*on the ground of such insanity,* and if they so find and declare, the court has the power to order him to be kept in strict custody in such place and in such manner as to the court shall seem fit, at the Commonwealth's expense, so long as such person shall continue to be of unsound mind. This section of the act has no bearing whatever on a case where the person is apparently or admittedly of unsound mind *when called for trial* and therefore totally incapable of advising with counsel. That situation is taken care of in section 67 of this act (19 P. S., section 1352), which provides that "the same proceedings [as prescribed in section 66] may be had, if any person indicted for an offense shall, upon arraignment, be found to be a lunatic, by a jury lawfully impanelled for the purpose, or if, upon the trial of any person so indicted, such person shall appear to the jury charged with such indictment to be a lunatic, the court shall direct such findings to be recorded, and may proceed as aforesaid." In the instant case the Commonwealth conceded that the prisoner was insane, as its psychiatrist had found and reported. The correct procedure to follow therefore was that prescribed by section 67 of the Act of 1860 (just quoted), or that prescribed by the Mental Health Act of 1923, section 308,[4] which latter act the warden

---

[4] Section 308 of the Mental Health Act of July 11, 1923, P. L. 998, provides that when any person detained in any prison, whether awaiting trial or undergoing sentence shall, in the opinion of the superintendent, jail physician, warden, or any other official, be insane, the said superintendent, jail physician, warden, or other official, shall make application immediately to a law judge of the proper court, for commitment of said person to a proper hospital for mental diseases. The proper court's judge shall forthwith order an inquiry by two qualified physicians who shall immediately make examination of the prisoner and report their findings. If, in their opinion, the person so detained is insane, the physicians shall so state and shall state also whether he is of criminal tendency, and the judge may, in his discretion, summon other witnesses and secure other evidence. If he is then satisfied that the person thought or alleged to be insane is in fact insane, he shall order the removal of such person to a hospital for mental diseases.

followed when before the trial he petitioned the court, asking it to order an inquiry into the prisoner's condition, etc. See also the Act of April 27, 1927, P. L. 431, at 433, sub-section b, amending section 311 of the Mental Health Act of 1923. Sixty-eight years after the Act of 1860, whose "statutory defenses" (under section 60) the trial judge declared the defendant in this case would be deprived of if he should not in spite of his obvious unsoundness of mind be put to trial, this court declared in Com. v. Scovern, 292 Pa. 26, 140 A. 611, that "a person who, by reason of his insanity, is unable to comprehend his position and to make a rational defense cannot be tried on a criminal charge while in that condition."

The court said in its opinion of September 13, 1933: "We fail to find that the Mental Health Act (1923) attempts to repeal the Criminal Code of 1860, . . . which latter act controls, in our judgment, the status of this defendant . . . but [who] stands squarely upon his constitutional and statutory rights, and which it is our solemn, sworn duty to assert for his benefit and in his behalf." We can conceive of no greater anomaly in law than for a court to put an insane prisoner in the position of "standing squarely upon his constitutional and statutory rights" to be tried. It would be no more absurd to hold that a seven-year-old child who had committed some act prohibited by law, could not without a jury trial, be by court order sent home to his parents or committed to some institution for mental diseases, because the Constitution of this Commonwealth declares that "trial by jury shall be as heretofore and the right thereof remain inviolate" and because the child "stands squarely upon his constitutional and statutory rights" to be tried.

The proposition that a person admittedly insane cannot legally be tried is so sanctioned by common sense that it needs the citation of no formal authorities for its support. Such authorities are numerous and in complete accord. Though at common law there were

many practices judicially permitted which the mores of this age justly condemn as barbarous, there was no time when the administrators of the common law with all *their* harshness and all *its* rigors would permit the trial of a person admittedly insane. Blackstone in his Commentaries, book 4, section 24, says: "In criminal cases idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities; no, not even for treason itself. Also, if a man in his sound memory commits a capital offence, and before arraignment for it he becomes mad, he ought not to be arraigned for it, because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if after judgment he becomes of nonsane memory, execution shall be stayed; for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." Blackstone refers to a statute passed "in the bloody reign of Henry VIII, . . . which enacted, that if a person being compos mentis should commit high treason, and after fall into madness, he might be tried in his absence, and should suffer death, as if he were of perfect memory. But this savage and inhuman law [he says] was repealed by the statute of 1 and 2 Ph. and M., c. 10."

"The true reason why an insane person should not be tried, is that he is disabled by an act of God to make a just defense if he have one. As is said in 4 Harg. Stat. Tr. 205, 'there may be circumstances lying in his private knowledge, which would prove his innocency, of which he can have no advantage, because not known to the persons who shall take upon them his defense.' The most distinguished writers on criminal jurisprudence concur in these humane views, and all agree that no

126

person, in a state of insanity, should ever be put upon his trial for an alleged crime, or be made to suffer the judgment of the law. A madman cannot make a rational defense, and as to punishment, furiosus solo furore punitur [a lunatic is punished by his madness alone]: 1 Hale's P. C. 34, 35; 4 Bl. Com. 395, 396; 1 Chit. Cr. L., ed. 1841, p. 761; 1 Russ. on Crimes, ed. 1845, p. 14; Shelf. on Lunacy, 467,* 468*; Stock on Non Comp. 35, 36": Freeman v. People, 47 American Decisions 216, 220. "The inquiry into the guilt of a person accused of crime must be postponed where he is insane, until such time as he shall be able to properly model his defense": Frith's Case, 22 How. St. Tr. 307.

Appellee objects that this appeal is premature because there was no entry of judgment on the verdict by the court below. It is true that the rule is that "there must be a final judgment or something in the nature of a final judgment before it is ripe for review in this court": Com. v. Ruth, 104 Pa. 294, 297. But this rule has, in exceptional cases and to safeguard basic human rights, been construed as not being one of unyielding inflexibility.

This court, in Com. v. Trunk, 311 Pa. 555, 167 A. 333, in an opinion by Mr. Justice SCHAFFER, said: "While it may be true generally that appeals may not be taken in criminal proceedings where judgment of sentence has not been passed, this rule should not be held one of universal application. There are instances where great injustice would thereby be done to defendants." See also Com. v. Patch, 98 Pa. Superior Ct. 464, where though sentence was suspended, the order appealed from was pronounced by the Superior Court as "final."

And further, as to the right of this court to set aside the verdict in this case though sentence was not formally passed upon defendant, it must be noted that the 13th section of the Act of May 22, 1722 (1 Smith's Laws 140), confers upon this court the power to "minister justice to all persons, and exercise the jurisdictions and

powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever as the Justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster or any of them, may or can do." This court, in Com. v. Balph, 111 Pa. 365, at 375-6, 3 A. 220, asks: "What are the powers of the King's Bench as it existed in England, where the Act of 1722 was passed?" and answers it by quoting Sharswood's Blackstone, Book III, page 42, as follows: "The jurisdiction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition." See also Com. v. Jones, 303 Pa. 551, 554, 154 A. 480; Stone v. Phila., 302 Pa. 340, 348, 153 A. 550, and Corbin v. George, 308 Pa. 201, 204, 162 A. 459.

As the entire record of the case is now before us, and as we have under the Acts of May 22, 1722 (1 Smith's Laws 140), and June 16, 1836, P. L. 785,[5] power "to minister justice to all persons" we can protect the rights of

---

[5] This Act of 1836 invests the Supreme Court with "power to hear and determine all, and all manner of pleas, plaints, and causes which shall be brought, or removed there from any other court of this Commonwealth, by virtue of any writ or process issued by the said court, or any judge thereof, for that purpose, in the manner now practised and allowed, to examine and correct all, and all manner of errors of the justices, magistrates, and courts of this Commonwealth, in the process, proceedings, judgments and decrees, as well in criminal as in civil pleas or proceedings, and thereupon, to reverse, modify or affirm such judgments and decrees, or proceedings, as the law doth or shall direct; and generally, to minister justice to all persons, in all matters whatsoever, as fully and amply, to all intents and purposes, as the said court has heretofore had power to do, under the Constitution and laws of this Commonwealth."

this appellant "by speedy and summary interposition." In the theoretically possible but practically unlikely event that he will ever attain soundness of mind, so that he would be capable of consulting with counsel, he would clearly be entitled to an opportunity to meet in a court of justice the murder charge laid against him. The so-called "trial" herein reviewed must be treated as a nullity and the verdict of guilty set aside.

In view of the fact that the order made by the trial judge on April 24, 1934, committing the defendant to the Farview State Hospital for the Criminal Insane was made pursuant to the Act of May 2, 1933, P. L. 224, and that the proceedings under this act can be had only "in case of the conviction of any person for any offense," this order must also be set aside.

In view of the further fact that the interests of society as well as of the appellant undoubtedly require that he be committed to an institution for mental defectives and in view of the fact that appropriate proceedings to this end were instituted by the warden of the Delaware County Prison on September 1, 1933, which proceedings were "suspended and stayed until further order of the court," said suspending and staying order must be set aside and the court below must proceed according to law upon the aforesaid petition.

Our judgment is: (1) that the verdict of the jury convicting this appellant of murder in the first degree be set aside and that a new trial be had when, if ever, this appellant is in mental condition to be legally tried; (2) that the order of April 24, 1934, committing the appellant to the Farview State Hospital be reversed and set aside; and (3) that the order of September 13, 1933, suspending and staying the proceedings under the prison warden's petition to the court to order a due inquiry into the prisoner's mental condition be reversed with a procedendo.