## UNITED STATES v. EBELING.
### No. 13.

Circuit Court of Appeals, Second Circuit.

Dec. 11, 1944.

David S. Kumble, of New York City, for defendant-appellant.

Vine H. Smith, Asst. U. S. Atty., of Brooklyn, N. Y. (T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Ebeling appeals his conviction upon an indictment under two counts, the first charging a conspiracy under 18 U.S.C.A. § 88 to violate the provisions of 22 U.S.C.A. § 233, and the second charging a conspiracy under 50 U.S.C.A. § 34 to violate the provisions of 50 U.S.C.A. § 32. 22 U.S.C.A. § 233, originally passed in 1917 and now appearing in 22 U.S.C.A. § 601 with increased penalties, in substance makes it unlawful for any one other than a diplomatic or consular agent to act in the United States as an agent of a foreign government without prior notification to the Secretary of State. 50 U.S. C.A. § 32, § 2 of the Espionage Act of 1917— quoted, together with 50 U.S.C.A. § 34, making its penalties also applicable to conspiracy, in United States v. Molzahn, 2 Cir., 135 F.2d 92, 93 note, certiorari denied Molzahn v. United States, 319 U.S. 774, 63 S.Ct. 1440, 87 L.Ed. 1721—in substance makes it unlawful for any person to transmit, directly or indirectly, to any foreign government or agent thereof any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense. The indictment named some thirty-three defendants, together with numerous other conspirators; of the defendants, all except fourteen pleaded guilty to one or both counts, while the fourteen were all convicted on both counts after a long trial. Defendant Ebeling was sentenced to imprisonment for two years, and to pay a fine of $1,000, on the first count, and to imprisonment for five years on the second count, the two terms of imprisonment to run concurrently. His appeal attacks the sufficiency of the evidence to sustain his conviction, as well as several rulings on the admission of evidence.

The extensive conspiracies as charged were alleged to have existed from August 1, 1936, to the time of the indictment, July 15, 1941. The testimony establishing the conspiracies is not before us, since, in order to shorten the record, the parties have entered into a stipulation whereby the defendant admits, for the purposes of appeal only, that the Government established at the trial "the existence of the conspiracy alleged in each count of the indictment without conceding that the Government has established the defendant Ebeling's connection with or participation in said conspiracies." The conspiracies centered about one Sebold, known to many of the defendants under his alias of Sawyer. Sebold, born in Germany, but naturalized as a citizen of the United States, had been approached when on a visit to Germany by agents of the German Reich, who requested him to obtain and transmit information of a character intimately relating to national defense. Sebold feigned compliance, but communicated with agents of the Federal Bureau of Investigation, and under their direction pretended to act with the German agents who had approached him and with others who later were placed in contact with him. We are told that the elaborate system of counterespionage thus undertaken went so far as to include the building of a radio transmitting station financed by the German Secret Service, but operated with full knowledge of the F. B. I. agents.

The testimony as to Ebeling showed that he had been employed since 1927 by the book publishers "Harper Brothers," and at this time was traffic department manager of Harper's subsidiary, Book Publishers Shipping Service, which shipped books and magazines of several publishers abroad. His business called upon him to obtain information relating to transatlantic sailings from a firm of freight forwarders, and the charges against him were that he transmitted such information to agents of the Reich. Sebold gave the substantial testimony against him, involving a meeting with him in New York City on June 10, 1941. During the conversation then had defendant took occasion to correct information already given by Clausing, another defendant, to the effect that the S.S. America was an auxiliary cruiser, not a troop ship, and he also corrected the name of another ship belonging to the Panama Railroad Line. "Then," as Sebold testified, "he said this coming week-end four steamers of the Prince Class of about 7,000 tons are leaving New York for London, and I should send that over as quick as possible—it was very important."

Defendant took the stand in his own behalf and admitted knowing some five of the defendants who had pleaded guilty to one or both counts of the indictment, with frequent contacts with some of them, who came to his home and his office, one in fact asking him for a statistical map showing export business from the United States to definite ports of the world for a certain year. Statements given by him to the F. B. I. agents shortly after his arrest also showed such contacts, as well as the meeting to which Sebold had testified.

■ The testimony given by Sebold, if believed, was clearly sufficient to connect this defendant with the conspiracies which stand here conceded. The necessary inference from the testimony is not only that defendant was passing on information he had acquired as to ship sailings, but that he knew of the information being given by other conspirators, so intimately in fact that he assumed the responsibility for correcting it, while asking for immediate transmission of his new information. Attack is now made on Sebold's testimony for claimed inconsistencies in his version of the meeting brought out on cross-examination; and it is claimed that the version given by defendant on the stand—admitting the meeting, but not the sinister portions of the conversation—must, therefore, be the true one. But these inconsistencies do not strike us as far-reaching; and, dealing with comparatively unimportant matters, such as how the conversation began, as they do, they may even have impressed the jury the more as showing an unrehearsed story maintained as to essentials. In any event, the issue of veracity was for the jury, which has settled it against the defendant. Nor is the point that the overt act charged in the first count against defendant—a meeting between him and a codefendant, Richard Eichenlaub, on June 10, 1941—was not proven, well taken. The conspiracy now being conceded as proven, it was only necessary for the prosecution to show further that defendant had participated in it. Further, defendant's own statement (as well as his testimony) showed that "Dick," i.e., Eichenlaub, was present at the beginning of his conversation with Sebold.

■ Of the rulings on evidence, the one most challenged is the admission of defendant's statement given to the F. B. I. agent the day after his arrest, now claimed to be inadmissible under McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. Another statement given the following day, June 30, 1941, was not objected to; therein defendant stated merely the version of the conversation which he later gave at the trial. There seem to us several reasons why the claimed error is not well taken. The only ground of objection then asserted was that no proper foundation had been laid for its receipt. Actually there was nothing in the statement itself to the prejudice of the defendant; its utility seems to have been limited—outside of his admission of contacts with other defendants, which he has never denied—to showing inconsistency with his later statement and testimony, for he then said that he had no conversation with the "stranger" whom he saw with others on the evening of June 10. There is no claim that the statement was forced; and the circumstances indicate his willingness to talk freely on both days. The McNabb rule was limited by United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, seemingly to the situation where the statement was occasioned or caused by illegal detention, which was not the case here.

■ Finally, under our decision in United States v. Keegan, 2 Cir., 141 F.2d 248, it seems that the detention was not illegal. There we held that the prompt arraignment contemplated by the applicable statutes did not require arraignment on the Fourth of July or Sunday. Here defendant was taken into custody Saturday evening, June 28, 1941, was questioned for a time and then permitted to go to bed, was seen by the agent on Sunday beginning at 10:30 A. M., and the statement was dictated to a stenographer late that afternoon. We do not think there was delay sufficient to make the detention illegal, so that, for example, defendant could have claimed, or sued for, false imprisonment. Cf. United States v. Bell, D.C.S.D.Cal., 48 F.Supp. 986, 994; Janus v. United States ex rel. Humphrey, 9 Cir., 38 F.2d 431, reversing D.C. Idaho, 30 F.2d 530.

■ Error is assigned in the refusal of the court to admit in evidence Sebold's report to the F. B. I. of his activities on June 10, 1941. This report was not used by Sebold in his testimony; and when demand was made of the Government to produce it, the court inquired whether there was anything in it that would tend "to exculpate Ebeling" or "would be to his advantage." The United States Attorney then showed it to the court, which announced that it had read it and saw "no reason why

the Government should be called upon to produce it," but that it could see "in the report reasons why it should remain a confidential document." Defendant took formal exception to the ruling, but did not then or later ask for its inspection or its incorporation in the record on appeal. He now relies on United States v. Krulewitch, 2 Cir., 145 F.2d 76, as justifying reversal. But the Krulewitch case was limited expressly to the situation where the prosecution had in its possession a document signed by a witness which definitely contradicted the important testimony she had given on the stand. A statement of like nature which did not, however, show such a contradiction would not have been admissible, as was held in United States v. Cohen, 2 Cir., 145 F.2d 82. The record here shows nothing to suggest any impeaching value to the report; indeed, the judge's statement shows the contrary. Had defendant wished to contest that statement, he should have taken steps to procure the inclusion of the document in the record, as was done in the Krulewitch case.

■ Finally, defendant objects to the admission in evidence of Sebold's visiting card and a paper containing Sebold's address and that of another defendant, found in the desk used by defendant at Harper's business office, as well as the address of still another defendant found at the defendant's home upon search after his arrest. Defendant claims that the search of his desk was illegal, although his general objection to the admission of the exhibits hardly made this clear. It would seem, however, that the employer who was in possession of the premises was the only one who could object to the search. United States v. Reiburn, 2 Cir., 127 F.2d 525; In re Nassetta, 2 Cir., 125 F.2d 924; United States v. Salli, 2 Cir., 115 F.2d 292. There is hardly enough of the record here to enable us to pass definitely upon the issue made of relevancy or the importance of the testimony in the trial; so far as we can see, the two exhibits were probably relevant, but unimportant. Much the same can be said as to the address obtained at the defendant's house. It is asserted that the search was illegal, cf. United States v. Lindenfeld, 2 Cir., 142 F.2d 829, certiorari denied Lindenfeld v. United States, 65 S.Ct. 89; Matthews v. Correa, 2 Cir., 135 F.2d 534; but it is claimed that the address was in the handwriting of defendant's wife and was obtained by her in the course of her beauty parlor business. This, too, would seem relevant, as showing defendant's general acquaintance with various of the codefendants in question—a fact which, as we have seen, was not contested. We find no error in these rulings.

Judgment of conviction affirmed.

FRANK, Circuit Judge (dissenting).

I do not agree with the ruling concerning the refusal of the trial court to require the government to permit defendant's counsel to inspect Sebold's report. To make my position clear, I must first state certain of the facts more fully than does the majority opinion.

Sebold, the government's chief witness, testified that on June 10, 1941, he had made a written report to the Federal Bureau of Investigation on his activities during that day, including his conversations with the defendant to which Sebold testified. He also testified that he had read over that report the day before he took the witness-stand to testify concerning those conversations. Defendant's counsel asked the District Attorney to produce that report. In reply to the District Attorney's question as to the purpose of the demand, defendant's counsel stated, "For attacking the credibility of the witness." No ruling was then made. The next day the demand was renewed. The District Attorney then handed the report to the trial judge who said, "I have read the report and I see no reason why the Government should be called upon to produce it, and I can see in the report reasons why it should remain a confidential document." Defendant's counsel then stated that he referred "only to that part of the report, of course, which has reference to the meeting or conversation with Ebeling, and no other party." But his request was nevertheless denied, and an exception was taken.

I assume, arguendo, that a statement disclosing a crime, made in confidence to a prosecuting officer, is privileged. But, as this court recently held in United States v. Krulewitch, 2 Cir., 145 F.2d 76, 79, the prosecution surrenders that privilege, if any, by calling as a witness the person who made the statement; for, as Judge Learned Hand there said, "It must be a condition of any such privilege that the prosecution—its possessor—shall not adduce testimony touching the subject matter communicated. Indeed, that is a general principle as to all privileged communications. When their possessor

chooses to bring into the light the transactions to which the communications relate, he may no longer suppress the communications themselves." Accordingly, we held that the defendant's counsel must be permitted to inspect such a written statement in order to allow him to attempt to impeach the witness' testimony.[1] True, there the witness had testified that she had made such a statement at variance with her testimony. But I do not think the doctrine of that case rests or should rest on that fact.[2]

It is also true that in the Krulewitch case, the statement was marked, sealed, and made part of the record on appeal so that we could see for ourselves that the statement did in fact contradict the testimony and that the refusal to admit inspection was therefore error.[3] But, especially as here we are dealing with a judgment depriving defendant of his liberty, I think we should suspend decision until the district court certifies the statement to us [4] so that we can ascertain whether or not it contained matter which properly could have been used for impeachment purposes, i.e., whether the trial judge abused his discretion.

The flexible procedure recently sanctioned in Addison v. Holly Hill Fruit Products, 322 U.S. 607, 64 S.Ct. 1215, in a review of a mere administrative regulation, furnishes an analogy. Surely on review of a judgment which sends a man to jail for five years, the procedure should be at least as flexible. In such circumstances, nothing will be lost and much which is dear to the spirit of our democratic institutions may be gained by making haste slowly. I, for one, could not sleep well if I thought that, out of a desire for unnecessary expedition, I had helped to affirm the conviction of a man who may be innocent.[5]

It has been suggested that because the Krulewitch doctrine diminishes the value of the privilege on which the government relies, that doctrine should be restricted.[6] But I believe that that privilege should be curtailed, for otherwise it gives sustenance to the general notion that the government, in prosecuting a citizen, should be zealously protected by the courts from disclosing to him evidence which it has gathered in preparing for trial and which may aid him in convincing a jury of his innocence. That notion is at variance with the basic principles of our form of government. Thus the Canon of Ethics of the American Bar Association states: "The primary duty of a lawyer engaged in a public prosecution is not to convict but to see that justice is done. The suppression of facts * * * capable of establishing the innocence of the accused is highly reprehensible." As the Wisconsin Supreme Court has said, "The district attorney is a quasi judicial officer. * * * 'A prosecutor should act not as a partisan eager to convict, but as an officer of the court, whose duty it is to aid in arriving at the truth in every case.' * * * 'His object, like that of the court, should be simply justice. * * *'" [7] Said the Supreme Court,[8] "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the

---

[1] Of course, the statement could not be used until after the witness was asked whether he had not stated what it purported to declare and given an opportunity to admit that he had. But, as we said in Krulewitch, "since the accused could not ask" the witness the "necessary questions in preparation for admission of the statement, it was proper for him to demand inspection, and the refusal was erroneous."

[2] Cf. Heard v. United States, 8 Cir., 255 F. 829, 832.

[3] See also United States v. Cohen, 2 Cir., 145 F.2d 82.

[4] It should, of course, be sealed.

[5] See Borchard, Convicting The Innocent (1932).

[6] Cf. the dissenting opinion in United States v. Krulewitch, supra.

[7] O'Neil v. State, 189 Wis. 259, 207 N. W. 280, 281.

[8] Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314. See also, e.g., Baker v. United States, 8 Cir., 115 F.2d 533, 543; Pell v. State, 97 Fla. 650, 122 So. 110, 111; Hillen v. People, 59 Colo. 280, 149 P. 250, 253; People v. Fielding, 158 N.Y. 542, 547, 53 N.E. 497, 46 L.R.A. 641, 70 Am.St. Rep. 495; Commonwealth v. Nicely (Appeal of Nicely), 130 Pa. 261, 18 A. 737, 738; Brower v. State, 26 Okl.Cr. 49, 221 P. 1050, 1051; 18 C.J. 1296, 1315–1316; 27 C.J.S., District and Prosecuting Attorneys, § 14, pp. 369, 404–405; 23 C.J.S., Criminal Law, § 1081, pp. 519–520.

servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." He should not try and no court should, I think, assist his efforts, to shut out scrutiny of evidence such as the witness' statement here, which may turn out to be "pregnant with importance in ascertaining the truth." [9]

The privilege on which the government here relies has a far flimsier foundation than that which the government unsuccessfully asserted in United States v. Andolschek, 2 Cir., 142 F.2d 503, 506; for the privilege there asserted was based upon a valid Treasury regulation, authorized by statute, providing that reports to the Treasury by its employees are not to be produced in court without the approval of the Secretary of the Treasury. There we said (per Judge Learned Hand): "While we must accept it as lawful for a department of the government to suppress documents, even when they will help determine controversies between third persons, we cannot agree that this should include their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the documents may possess; it must be conducted in the open, and will lay bare their subject matter. The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully. Nor does it seem to us possible to draw any line between documents whose contents bear directly upon the criminal transactions, and those which may be only indirectly relevant. Not only would such a distinction be extremely difficult to apply in practice, but the same reasons which forbid suppression in one case forbid it in the other, though not, perhaps, quite so imperatively. We hold that the regulation should have been read not to exclude the reports here in question. We cannot of course know, as the record stands, how prejudicial the exclusion may have been, but that uncertainty alone requires a new trial; for it does not affirmatively appear that the error was insubstantial within the meaning of 28 U.S. C.A. § 391." The considerations which in Andolschek induced us to hold that the privilege had been waived have an even more pronounced cogency here.

Nothing I have said should be taken as even suggesting that here the District Attorney acted unethically: he did not object to the examination of the witness' report by defendant's counsel but handed the report to the trial judge who denied the request for examination. Nor do I mean that the trial judge acted unethically. I do mean that he and my colleagues have adopted a rule which is, I think, incompatible with the principles underlying the authorities from which I have quoted.

---

[9] United States v. Krulewitch, supra.