STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. WIL-
LIAM P. WALTER AND WILLIAM J. MARREN, PLAIN-
TIFFS IN ERROR.

Argued October 6, 1935—Decided July 18, 1936.

Before BROGAN, CHIEF JUSTICE, and Justices LLOYD and
DONGES.

For the plaintiffs in error, *Kenneth J. Dawes* and *Merritt
Lane*.

For the defendant in error, *Erwin E. Marshall* and *Leo J.
Rogers*.

The opinion of the court was delivered by

DONGES, J. Plaintiffs in error were convicted at Mercer
Quarter Sessions of non-feasance in office. Walter was chief
of police and Marren was sergeant of police of the city of
Trenton. They were jointly indicted for non-feasance in
permitting certain disorderly houses and houses where lot-
tery and numbers business was unlawfully carried on to
operate. They were also indicted for accepting moneys to
permit the operations aforesaid, but the prosecutor elected
to stand upon the first count only.

Ninety assignments of error and ninety-three specifications
of causes for reversal have been filed. These have been argued
under ten heads.

The first point argued is that the court erred in declining
to arrest the judgment, because the indictment was defec-

tive in that, in the first count, it charged each defendant with a separate and distinct offense, and also erred in declining to grant a motion to compel the state to elect against which defendant it would proceed.

This was recently decided adversely to the contention of plaintiffs in error in *State* v. *Preiskel et al.,* 13 *N. J. Mis. R.* 736, and, as stated in the brief of plaintiffs in error, that case is controlling here.

Under point II complaint is made of certain questions asked the defendant Walter on cross-examination as to whether or not he had on some occasion refused to permit the assistant prosecutor to see certain records under his control at police headquarters, and questions asked the director of public safety and a clerk at police headquarters concerning the attempt by the prosecutor to get access to the records. It does not appear how the defendants were harmed by these questions. They had to do with a collateral matter that crept into the case, but we fail to see how they could influence the jury in reaching a conclusion on the guilt of the defendants of the charge laid in the indictment. Furthermore, it does not appear that the answers to the questions brought out anything injurious to defendants. Walter's testimony was to the effect that he had refused the assistant prosecutor access to the records until he consulted his superior, and that thereafter he disclosed some and refused others, in accordance with the instructions received from 'the director, who testified to the same effect. We see no harmful error in this.

Point II-A is directed to certain questions asked the defense witness Sergeant Bentley concerning statements he is alleged to have made to the assistant prosecutor. The line of examination was permitted for the purpose of testing the witness' credibility. Most of the questions were answered before any objection was made, and we can see no prejudice to the defendants in view of the answers, which were "no" or "I can't remember" in most cases.

Point II-B deals with testimony of the witness William Murphy, on rebuttal, with regard to an incident when the defendant Walter was present at a saloon conducted by the

witness Harry Rednor. This was competent in view of Walter's denial that he was acquainted with Rednor.

Point II-C is directed to questions asked the witness George J. Brunn concerning testimony he gave in the grand jury room which was at variance with his direct examination at the trial, and were proper questions to test the credibility of the witness. *State* v. *Silverman,* 100 *N. J. L.* 249; 126 *Atl. Rep.* 618; *State* v. *Bovino,* 89 *N. J. L.* 586; 99 *Atl. Rep.* 313.

Point III deals with certain testimony of a witness for the state.

A. The witness Angel Pelletteri was asked "at the beginning of the syndicate who handled the money and paid the expenses?" This witness had testified that he, one Tomes and Harry Rednor, the principal state witness, were associated in the numbers business. Rednor had testified that for a time he handled the money and paid money weekly to the defendants for protection. The answer to the question objected to was that Tomes had handled the money at the beginning of the syndicate. It is difficult to see in what way this question and answer were harmful to the defendants. The trial judge had already indicated that he would not permit testimony of actual transactions of the syndicate in the absence of the defendants, but testimony from this witness of the general method of operation would seem to be proper in corroboration of Rednor's testimony. At any rate there was no harm to the defendants in this question.

B. That it was error to permit the following question to the witness Oscar Ungaro, "did you shortly before the time your place was raided and you were arrested for numbers, have any conversation with Angel or Tomes or anyone connected with the syndicate in reference to your taking a 'knock-off' for them, or a set-up?"

C. That it was error to refuse to strike the testimony of this witness.

Ungaro was permitted to testify that through an arrangement with the members of the so-called numbers writing syndicate, he stationed himself in his place of business with fictitious numbers slips on his person and submitted to arrest

at the hands of a group of police led by the defendant Sergeant Marren. This evidence was admitted subject to its being connected up with the defendants and the motion to strike was on the ground that it had not been so connected. The trial judge ruled that sufficient connection had been shown in the testimony of the previous witness, Rednor, who testified that Marren came to his home and told him he must submit to a "knock-off" or arrest. Rednor testified, "he told me the other bankers are taking it and I am supposed to take it. He says Tomes took it, then Oscar Ungaro took one, and I says, 'no, not to-day.'" In view of this testimony, we think the motion to strike was properly denied.

The fourth point deals with alleged error in admitting certain testimony of Rednor. It was brought out on the cross-examination of Rednor that at one appearance before a grand jury he had given evidence at variance with his testimony at the present trial. He was then permitted to say that he had been threatened by three armed men at three o'clock in the morning while on his way from his garage to his home and told that if he testified against "the chief" before the grand jury, at his scheduled appearance later in the morning, he would get "bumped off." We think it was proper to permit him to give an explanation of any variance in his testimony on the two occasions, and that there was no error in admitting these questions.

Point V complains of questions asked the defendant Marren concerning an arrest he made on a numbers charge outside the city of Trenton and questions asked the defense witness Patrolman Brunn, a member of Marren's numbers squad, concerning alleged arrests and searches without proper warrants. These are claimed to be harmful on the theory that the jury might infer that because defendants used unlawful means to enforce the law on some occasions, they were under a duty to use such means in enforcing the law in the respects in which they are charged in the indictments with nonfeasance. We are of the opinion that the jury could get no such impression as this from this evidence. The court charged the jury that it was the duty of the defendants to use all

proper, reasonable and effective means to enforce the law. We find no harmful error in this point.

Point VI brings up a line of questions directed to Chief Walter on cross-examination as to whether or not complaints had been made to him concerning Marren's activities in the numbers business, accepting money from numbers writers, &c. The complaint is that hearsay evidence was permitted prejudicial to the defendant Marren. However, the trial court repeatedly told the jury that this evidence was not to be considered as affecting the defendant Marren at all. He said, "this line of testimony has no relation to the case of the state against the defendant Marren." Since the evidence was otherwise admissible, there was no error in this action of the trial court.

Point VII deals with the presence of certain "slips," which were prepared to resemble those contained in an exhibit, marked *D-2* for identification and marked in evidence as *Exhibit D-27*, and used to discredit the testimony of witnesses who apparently identified them as part of the exhibit of genuine "slips," and with the action of the trial court in permitting the assistant prosecutor to testify with respect thereto. We conclude that the defendants were not prejudiced in having a fair trial within their constitutional rights by reason of the matters complained of under this point.

The eighth point alleges that because of the conduct of the assistant prosecutor in the examination of Walter, and with respect to *Exhibit D-27*, and in other respects, the defendants were prejudiced in having a fair and proper trial and were deprived of their liberty and property without due process of law within the meaning of the constitution of New Jersey and the fourteenth amendment of the constitution of the United States. A consideration of the entire record persuades us that this point is without merit.

Point IX deals with the refusal of the trial court to charge certain requests to charge, which, in effect, were that a conviction should not be found upon the testimony of accomplices unless corroborated by other testimony than from fellow conspirators. There was no error in declining to

charge as requested on this subject. *State* v. *Hyer,* 39 *N. J. L.* 598; 58 *Atl. Rep.* 107; *State* v. *Simon,* 71 *N. J. L.* 142; *State* v. *Bove,* 98 *Id.* 350; 116 *Atl. Rep.* 766; *affirmed,* 98 *N. J. L.* 576; 119 *Atl. Rep.* 926.

The last point argued is that the verdict was against the weight of the evidence and was the result of bias, passion and prejudice. A careful consideration of the voluminous record leads us to the conclusion that the evidence amply justified the verdict as to both defendants. The principal state witness Rednor told a complete, reasonable and credible story of the relationship between the defendants and persons in the unlawful numbers business. His story was corroborated from many angles by circumstantial matters and by the testimony of disinterested and reputable citizens. The defendants and many of their witnesses were enmeshed in contradictions and obvious untruths. Without reviewing the proofs in detail, we are of the opinion that the verdict was not against the weight of the evidence.

Upon examination of the record of the whole proceeding, we conclude that it does not appear that upon rulings upon evidence, the charge of the court and the conduct of the trial, the defendants suffered manifest wrong or injury.

The judgment is affirmed.