21 N.J. Super. 180 (1952)
91 A.2d 65
STATE OF NEW JERSEY
v.
WALTER G. WINNE, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided August 18, 1952.
*185 Mr. Theodore D. Parsons, Attorney-General of New Jersey, for the State; Mr. David H. Harris, Special Deputy Attorney General, of counsel.
Mr. John W. McGeehan, Jr., for the defendant; Mr. Joseph Weintraub, of counsel.
HUGHES, J.S.C.
Walter G. Winne, Prosecutor of Bergen County, was indicted by a Special Grand Jury of that county in an indictment purporting to charge him with misconduct in office, in that he was criminally nonfeasant in the performance of the duties of his office. By an appropriate motion to dismiss, the defendant challenges the sufficiency and *186 validity of such indictment. Several grounds are advanced in support of the motion, some of which seem of such novel impression in our State, at least with regard to the office of prosecutor, and hence of such public import, as to invite some brief attention to the interesting, if not technically relevant, setting in which the indictment was returned.
The defendant has been in office since April 1944 as Prosecutor of the Pleas, as this constitutional office was designated in our 1844 Constitution, and, since the adoption of our present constitution, as County Prosecutor. These constitutions did not define the duties of such prosecuting attorneys, but the statutes have something to say about them, although no elaborate, all-inclusive statutory pattern of mandatory or ministerial duties is set out. The statute which prescribed duties in which the indictment here alleges defendant was derelict (R.S. 2:182-5, now N.J.S. 2A:158-5) provided:
"Each prosecutor shall be vested with the same powers and be subject to the same penalties, within his county, as the attorney general shall by law be vested with or subject to, and he shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." (Italics ours.)
During the incumbency of this defendant in office, great public interest was aroused by disclosures of the growth of unlawful gambling on the American scene in general, and its causal relationship with official corruption, particularly among enforcement officers charged by law with its suppression. From a tolerance reminiscent of the sterilizing and cynical double standard of the Prohibition era, the public belatedly realized that it had arrived at a crossroads of decision with the modern colossus of unlawful gambling, at least that ubiquitously referred to as "professional" gambling. Authoritative recognition was given the now obvious fact that the profits of such gambling were the sinews of hoodlum empires loosely constituting a very super-government of strangling influence, and that the "creeping paralysis of law enforcement which results from a failure to enforce the gambling *187 laws spreads to other types of crimes and leads to a general breakdown in law enforcement."[1] In company with certain other American communities, Bergen County attracted in the press and otherwise[1] an attention born of the apparently well-founded suspicion that gambling flourished there, and that its laggard suppression was due to official connivance and corruption. On October 14, 1950, the Attorney General of New Jersey formally commenced an investigation into such suspected gambling and official misconduct in such county and designated a Deputy Attorney General to function therein for that purpose. On December 1, 1950, the Bergen County Board of Freeholders, by resolution, requested the Attorney General to supersede defendant as Prosecutor, and that was done by virtue of the authority of the statute. L. 1944, c. 20; R.S. 52:17A-4(f). A Grand Jury additional to the regular Grand Jury was empaneled on January 3, 1951 and by various extensions functioned until its discharge on May 7, 1952. During the official life of that Grand Jury, it returned some 201 indictments concerning a multitude of crimes of gambling and official misconduct, and the record indicates that more than half of these have thus far eventuated in pleas of guilty or convictions after trial. On November 28, 1951, that Grand Jury returned the instant indictment.

THE INDICTMENT
This indictment purports to charge derelictions of duty amounting to what would have been, at the common law, acts of criminal nonfeasance in public office, punishable as misdemeanors by the force of our statute absorbing offenses of an indictable nature at common law, which were not specifically delineated in the Crimes Act.[2]
*188 The first sixteen counts of the indictment are not unlike in basic respects, and will be described first. After sufficiently categorizing defendant as a Prosecutor and a public officer during the times relevant to the offenses charged, the indictment first charges the nature of his material public duties, in language somewhat more broad but, I think, of fair import, based upon the statute above mentioned.[3]
Next, the indictment particularizes this public duty in relation to the preservation of the public peace and good order in Bergen County in general, and, in particular, to the suppression of disorderly houses functioning as the site of illegal gambling, and of such unlawful gambling itself, to the seizure and confiscation of the furniture and implements used therein, and for the enforcement of the laws of this State relating to gambling, the draftsman keying his description of the general gambling offenses, on which the public duty of suppression, arrest and the like would be operative, to the description of such offenses in the statutes. R.S. 2:135-1, et seq., now N.J.S. 2A:112-1, et seq.
The succeeding paragraph charges that defendant had under his direction in his public office the necessary assistant prosecutors, detectives and investigators to put within his means the power to carry out the public duties of enforcement so enjoined upon him.
Up to this point, while a world of dispute may exist as to the implications of the legal conclusions and factual observations expressed as to defendant's duties, his powers and his available means to fulfill the same, I think no purpose would be served by repeating the exact wordage of these allegations. This is particularly so since they are brought to bear again in integral reference to the succeeding more specific charging *189 parts of the indictment. I do not mean to discount the importance of these allegations, which are common to all sixteen counts referred to, and which in their nature are crucial in principle, as distinguished from their mere precise phraseology.
Going to the specific nonfeasance charged in this portion of the indictment (set forth in full because essentially common to such sixteen counts[4]), it is charged that at certain times *190 and at a designated address and place in Bergen County, there were kept and maintained gambling and betting houses wherein certain forms of unlawful gambling were carried on, and the furniture and implements used therein stored and possessed, all in violation of law. The significant charge is then made in unmistakable language that the defendant Prosecutor then and there well knew that these violations were going on. The culprit or culprits participating in or responsible for these violations are not identified.
Defendant's departure from duty is set out as follows: That despite such knowledge, and disregarding the duties so enjoined upon him by law, he continuously, unlawfully and willfully did neglect and omit to perform such duties and to use and exercise all lawful and diligent means within his power as Prosecutor for the detection, arrest, indictment and conviction of the person or persons maintaining such resorts for unlawful gambling and responsible for the gambling violations referred to. While defendant is charged with knowledge of these alleged gambling operations, it is again noticed that he is not claimed to have known the identity of the persons responsible therefor.
The succeeding fifteen counts charge the same fabric of alleged nonfeasance of duty with respect, however, to alleged gambling houses and violations maintained and committed at other times and places, all of course within his territorial jurisdiction as Prosecutor of Bergen County. In none of these counts is there any reference to the identity of the alleged offenders against the law.
The indictment words mentioned, i.e., "continuously, unlawfully and wilfully," have been underlined because of the State's contention, as will be mentioned hereafter, that these words, fairly construed in the light of defendant's scienter, supplied the element of corrupt motive which the defendant maintains is a sine qua non of a valid charge of criminal nonfeasance of discretionary duty on the part of a quasi-judicial officer. Concededly, there is no expressed charge here, that defendant had any corrupt motive in the alleged *191 nonfeasant conduct, and the crucial nature of this assertedly unprecedented lack will be discussed later.
Now as to the remaining three counts of this indictment, while they contain charges of shocking moral implications, their legal insufficiency is so apparent that their mere analysis suffices to condemn them in law.
These counts contain the same substantial averments as to the defendant's duties and powers which are prefatory to the specific instances of alleged nonfeasance referred to in the earlier counts of the indictment. Count 17, however, goes on to allege the nonfeasance, on a specific date, as follows:
That defendant, as Prosecutor of Bergen County, "did receive a complaint charging that one Henry Wysock, who was then and there a member of the Rutherford Police Department in the said County of Bergen, was a corrupt public official, so called, in violation of the laws of this State."
The count further charges that defendant knew Wysock; but that disregarding his duties, he continuously, etc., failed to use all proper, etc., means for the detection, arrest, indictment and conviction of said Wysock, and suffered and permitted said Wysock to continue in public office.[5]
*192 This charge and similar ones contained in Counts 18 and 19, with respect to two other local police officials, are meaningless in law. Without discussing in detail the extent to which the underlying substantive offense must be particularized in order to validate a charge of prosecutive nonfeasance in relation thereto (State v. McFeeley, 136 N.J.L. 102 [Sup. Ct. 1947]), it is self-evident that no basic crime is charged by the epithet "a corrupt public official, so called, in violation of the law of this State." There have been instances in which our laws sought to punish a person by reason of a status, such as the legislative characterization of a "gangster" as an enemy of the State, the defining thereof and the fixing of penalty therefor (R.S. 2:136-1, et seq.), but this statute was constitutionally abortive. Lanzetta v. State, 306 U.S. 451, 59 S.Ct. 618, 621, 83 L.Ed. 888, 59 S.Ct. 618 (U.S. Sup. Ct. 1939); In re Rose, 122 N.J.L. 507 (Sup. Ct. 1939); In re Connellan, 123 N.J.L. 229 (Sup. Ct. 1939). Of this statute the United States Supreme Court said "The challenged provision condemns no act or omission; the terms it employs to indicate what it purports to denounce are so vague, indefinite and uncertain that it must be condemned as repugnant to the due process clause of the Fourteenth Amendment." Lanzetta v. State, supra, [306 U.S. 451, 59 S.Ct. 621].
These three counts of the instant indictment plainly predicate the whole of the defendant's obligations upon his knowledge of the status of the particular policeman as being a "corrupt public official, so called" and do not recite things *193 done or omitted by such officer bringing about such status. I am not aware that the status of being a "corrupt public official, so called" is a crime which ought to have invoked the prosecutive duties of the defendant, although there are a multitude of crimes involving official corruption, the committing of which would be punishable and would certainly justify the use of that epithet. A police officer who accepted bribes or committed other offenses of official corruption could be apprehended, tried, convicted and sentenced for such crimes, and have completed his sentences, and he would still remain to the end of his days a "corrupt public official, so called." Such an officer could no longer be prosecuted for such offenses and yet these counts charge defendant with criminal nonfeasance in not taking steps to bring about such prosecution. Or the Grand Jury could have believed that a police officer who met socially with gamblers or other criminals was a "corrupt public official, so called," or might have predicated this charge on many other circumstances, none of which would have amounted to criminal activity of any kind. Or, especially in view of the charge that defendant "then and there unlawfully did suffer and permit the said Henry Wysock to continue in public office," the Grand Jury might merely be charging here that the defendant Prosecutor failed to use his community influence to accomplish the policeman's ouster from office, regardless of his provable or punishable implication in any specific crime of official corruption. Such an ouster, of course, would be no part of the duty of defendant as a Prosecutor. In other words, these counts, although charging the respective policemen with being "corrupt public official(s), so called" to the knowledge of defendant, nowhere charge such officers with the committing of specific crimes of official corruption. Even the most zealous of prosecutors could not prosecute a person for being a "robber" or a "prostitute," but for committing crimes of robbery or prostitution, as the case may be. The most that can be said of these counts in their basic parts is that they are denunciations of conditions which existed, comparable to the murmurs *194 of an oppressed householder that his grocer or his tax assessor is a "robber," and however sympathetically these protests may be viewed, they are equally meaningless in fact, in intent and in law.
Judged from every aspect, the charges in these three counts do not even approach the allegation of the committing of crimes which should have brought into action the statutory duties of defendant, the nonperformance of which would justify a charge of nonfeasance. Indeed, it is difficult to imagine charges of less certainty or legal sufficiency than these, and reasonable certainty is a prerequisite to the validity of an indictment. State v. DeVita, 6 N.J. Super. 344 (App. Div. 1950). Consequently, I determine preliminarily that these counts must be dismissed, even before proceeding to the more fundamental questions affecting the validity of the first sixteen counts of the indictment.

THE GROUNDS OF THE MOTION.
In broad outline, the many grounds advanced to challenge the indictment may be expressed in the following categories:
1. The crime of nonfeasance as it relates to a prosecutor.  On this issue, which in my view is the most fundamental question presented here, the proposition is urged that a prosecutor is a quasi-judicial officer; that his duties and obligations with respect to the prosecution of specific offenses are discretionary in nature; that his nonperformance of the prosecutive function, even as outlined in the statute (R.S. 2:182-5, supra), however deliberate, may, in conception of law, be equally responsive to the honest use of such discretion as to any putative wrongness of purpose; that included in this area of the prosecutive function is the decision as to whether there is probable cause to believe that a crime has been committed, and as to when, where, how, or under what circumstances, if at all, the prosecutive steps to punish the same are to be pursued. Hence it is insisted that the nonperformance of duty with respect to these matters subject to a *195 quasi-judicial discretion, to amount to a criminally punishable nonfeasance, must be attributed to a corrupt or evil motive. On this issue, two points should be noticed here:  first, it is insisted that the instant indictment is one of first impression in our State, in that it condemns the nonperformance of the quasi-judicial and discretionary duty of a prosecutor, without ascribing same to a corrupt or evil motive; secondly, there is distinguished from the instant question that type of nonfeasance which would justify impeachment, removal or being superseded in office.
2. Nonfeasance of a prosecutor as relates to police duties.  In like vein, the defense seeks to rebut the suggestion of the indictment that the statutory enjoinder to use all reasonable and lawful diligence for the "detection" and "arrest" places upon the prosecutor, primarily vested, as was the Attorney General at common law with the lawyer's function of prosecution before grand jury and court, the added investigative and police duty of apprehension and arrest of offenders against the laws. The basis of this claim is the oft-repeated theme that initial enforcement of law rests on the local level with police and other peace officers, and that while the prosecutor shares such powers, his use of them in specific instances is discretionary; and that for a willful, even a wrong use of that discretion he is not responsible criminally, unless corrupt in motive.
3. The insufficiency and uncertainty in fact as to the nonfeasance charged.  Passing from its criticism of these fundamental concepts of the indictment, to a discussion of the basic content thereof, the defense next takes issue with the breadth and generality of the allegations of the duty itself and the lapse of performance therein. It contends that the mere general conformance of the charging language to the statutory words phrasing the duty is uninformative as tested by the standards of information required of an indictment for crime.
4. Failure of particularity in alleging the crimes basic to the nonfeasance.  By this point, the defense asserts that *196 before there can be invoked the public duties in which the defendant is claimed to have been derelict, there must have been the commission of crime and participation of offenders therein which would call for the performance of duties leading to their detection, arrest, indictment and conviction; that to validate the charge of nonfeasance in relation thereto, such crimes should be delineated with sufficient certainty as to enable a determination on the face of the indictment that the duty basic to the nonfeasance has in fact arisen. It urges that the indictment does not meet these standards, but the State rejoins that the basic crimes have been alleged with enough particularity to apprise persons indicted for those misdemeanors of the offenses they would be called upon to meet, and that such particularity is likewise sufficient in an indictment charging official misconduct in not prosecuting such offenses. State v. McFeeley, supra.
5. That the indictment is duplicitous and prejudicially misjoins nineteen unconnected offenses.  The State contends again, in reliance on State v. McFeeley, supra, that "an indictment based upon the accusation of official misconduct in office is not invalidated by the allegation of divers acts, committed on different days, which differ in their nature and which constitute distinct offenses against the law, so long as they are cognate to the charge of official misconduct."

THE PROSECUTOR AS A QUASI-JUDICIAL OFFICER
The office of prosecuting attorney of the county by whatever name it is known, such as District Attorney, Prosecutor of the Pleas, State's Attorney, or the like, is a public office, solely the creature of the constitutions or laws of the various states. In this State it was and is a constitutional office. 1844 Const., Art. VII, Sec. II, par. 3; 1947 Const., Art. VII, Sec. II, par. 1. It is said generally that this office is "carved" out of that of the Attorney General of the State and made an independent office having control of the criminal business of the State arising within such county. 42 Am. Jur., "Prosecuting Attorneys," Sec. 2; 27 C.J.S., "District *197 and Prosecuting Attorneys," Sec. 1; 2 Lincoln's Constitutional History of New York, 529; Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322, 55 S.Ct. 678 (U.S. Sup. Ct. 1934); Com. v. Ragone, 317 Pa. 113, 176 A. 454 (Sup. Ct. Pa. 1935). And such was the derivation of the office in New Jersey. State v. Longo, 136 N.J.L. 589 (E. & A. 1947).
The forerunner of the present day prosecutor was the deputy which the Attorney General was authorized to appoint to prosecute the pleas in such counties as he might not be able to attend in person. L. 1812, pam. 23; Pennington's Laws 1703-1820. This act was repealed by one passed November 9, 1822, which vested the authority for appointment of persons to prosecute the pleas, in the respective Courts of General Quarter-sessions of the Peace in the counties of the State. Laws of New Jersey 1822-1828, p. 25. This method was found unsatisfactory and the act repealed and such power to appoint prosecutors of the pleas was vested in the joint session of the Council and Assembly. Act of December 11, 1823; Harrison's Laws of New Jersey 1821-1833, p. 49. The Constitution of 1844 provided for the appointment of prosecutors of the pleas by the governor, with the advice and consent of the Senate (Art. VII, Sec. II, par. 3, supra) and was implemented by the act of April 16, 1846 (L. 1847, p. 832), which said of such prosecutor "* * * whose duty it shall be to prosecute the pleas of the state in such county, in the absence of the attorney-general: And further, to do and perform such acts and things in behalf of the state, in and about such prosecutions as the attorney general might or ought to do, if personally present." The duty of such prosecutor was further touched upon in L. 1898, c. 237, Sec. 95, p. 901 and in L. 1933, c. 19, p. 35, which provided the same enjoinder as controls the present indictment and is contained in the present statute, i.e., to the use of "all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."
*198 Most of these statutes, and probably others not particularly necessary to trace the chain of derivation of the office, imposed upon the prosecutors of the counties the duties, powers and responsibilities of the Attorney General. Putting aside the sub-division of function and authority which is part of the statutory pattern, i.e., "the criminal business of the state shall be prosecuted exclusively by the prosecutors of the pleas, except * * *" (R.S. 2:182-4; State v. Longo, supra), there is no doubt that the lines of service and the nature of the functions of the Attorney General and the prosecutor are the same. In fundamental concept, then, the extent to which they are quasi-judicial officers, and the nature of their prosecutive functions from the standpoint of the use of discretion, are alike assessable by a common standard. And so it has generally been thought.
The Attorney General was the "King's counsel, learned in the law." 3 Blackstone Comm. 27. While New Jersey sought to codify the common law duties of its Attorney General in 1854 (L. 1854, p. 131), this was, of course, a superficial tabulation of certain primary duties expected of him, with the closing admonition "to attend generally to all matters in which the state is a party, or in which its rights and interests are involved." This very act imposed upon the prosecutors the traditional prosecutive role of the Attorney General in providing that "after the passage of this act the criminal business of the state shall be prosecuted exclusively by the prosecutors of the pleas, except * * *" in certain contingencies comparable to the exceptions in the present statute. R.S. 2:182-4, supra.
Where a power rests in judgment or discretion, so that it is of a judicial nature or character, but does not involve the exercise of the functions of a judge, or is conferred upon an officer other than a judicial officer, it is generally deemed "quasi judicial." Throop, Public Officers, Sec. 533. It is defined as a term applied to the action and discretion of public administrative officers, who are required to investigate facts, or ascertain the existence of facts, and draw *199 conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature. Black's Law Dictionary, 2d ed., 669. In contrast it is said that an official duty is "ministerial" when it is absolutely certain and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion. Official action is ministerial when it is the result of performing a certain and specific duty arising from fixed and designated facts. A ministerial act is one which a public officer is required to perform upon a given state of facts in a prescribed manner, in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed. Garff v. Smith, 31 Utah 102, 86 Pac. 772 (Sup. Ct. Utah 1906); 120 Am. St. Rep. 924; People v. Bartels, 138 Ill. 322, 27 N.E. 1091 (Sup. Ct. Ill. 1891); State v. Meier, 143 Mo. 439, 45 S.W. 306 (Sup. Ct. Mo. 1898).
In the area of "prosecuting the criminal business of the state," I am not aware of any statutory or common law outline of ministerial steps to be performed in given circumstances,[6] and in the very nature of this office such would seem impossible. How could there be an advance formula admeasuring the evidence necessary to constitute probable cause to believe that crime had been committed? Or in what manner could there be an outlining of circumstances sufficient to require, in a ministerial sense, that prosecution be embarked upon? The Attorney General and prosecutor alike are cast in the role of "ministers of justice" and have always *200 been so viewed by the courts. In the very nature of things the dispensation of justice by such minister must be a quasi-judicial function and call for the exercise of discretion in the steps leading to the accomplishment thereof. I believe that such is the consensus of judicial thought concerning the nature of those offices and those duties.
It has been said that "a duty rests upon a district or prosecuting attorney to prosecute the violators of the criminal laws of the state whom he knows or has reason to believe to be guilty of such violations, but that this duty is not absolute, but qualified, requiring of him only the exercise of a sound discretion, which permits him to refrain from prosecuting, or having commenced a prosecution, to enter a nolle prosequi, whenever he, in good faith and without corrupt motives or influences, thinks that a prosecution would not serve the best interests of the state, or that, under the circumstances, a conviction could not be had, or that the guilt of the accused is doubtful or not capable of adequate proof." State ex rel. McKittrick v. Wallach, Mo., 182 S.W.2d 313, 155 A.L.R. 10.
In this respect it may fairly be said that every terminal obligation enjoined upon the prosecutor by the instant statute, i.e., the detection, arrest, indictment and conviction, constitutes a step in the criminal prosecution of an offender and hence cannot be considered apart from a decision to embark upon such prosecution. This decision, even if tentative in nature, would seem to call for a quasi-judicial use of the discretion vested in him as a minister of justice. A prosecutor does not, or at least should not, participate in detection or arrest unless there appears to be reasonable ground therefore, for it is elementary that every prosecution for crime should be based upon probable cause. And probable cause has been said not to "depend on the actual state of the case, in point of fact, but upon the honest and reasonable belief of the party commencing the prosecution." Bacon v. Towne, 4 Cush. 217 (Sup. Jud. Ct. Mass. 1849).
*201 Of prosecutors it has been said that "as a judicial or quasi-judicial officer he has a certain discretion as to when, how and against whom to proceed." 23 Am. & Eng. Encyc., 2d ed., 275; that "a public prosecutor is a quasi-judicial officer, retained by the public for the prosecution of persons accused of crimes, in the exercise of a sound discretion to distinguish between the guilty and the innocent, between the certainly and the doubtfully guilty"; that "the office of district attorney is a constitutional office. It is held as a public trust, and the incumbent is charged with the grave responsibilities calling for the exercise of learning in the law and sound judgment." Ex Parte Bentine, 181 Wis. 579, 196 N.W. 213, 216 (Sup. Ct. Wis. 1923); that they are "quasi-judicial" officers; Rock v. Ekern, 162 Wis. 291, 156 N.W. 197, L.R.A. 1916 D, 459 (Sup. Ct. Wis. 1916); State ex rel. Ward v. Romero, 17 N.M. 88, 125 Pac. 617 (Sup. Ct. N.M. 1912); Edelman v. Dunn, 8 N.J. Misc. 154 (Sup. Ct. 1930); McDonald v. Goldstein, 273 App. Div. 649, 79 N.Y.S.2d 690 (N.Y. Sup. Ct., App. Div., 1948); that "the district attorney is more than a prosecuting officer. He is a quasi-judicial officer. He has a broad discretion in the handling of all criminal matters in his county." People ex rel. Pringle v. Conway, 121 N.Y. Misc. 620, 202 N.Y. Supp. 104, 106 (Sup. Ct. N.Y. 1923); that "the United States Attorney and his assistants are officers of the court, holding quasi-judicial positions. It is their recognized duty, not only to prosecute the guilty, but also to protect the innocent * * *." Griffin v. United States, 295 Fed. 437, 439 (3 C.C.A. 1924); that "the district attorney is a quasi-judicial officer. He represents the commonwealth and the commonwealth demands no victims. It seeks justice only,  equal and impartial justice." Com. v. Nicely, 130 Pa. 261, 18 Atl. 737, 738 (Sup. Ct. Pa. 1889); that "the district attorney is a quasi-judicial officer. * * * In the trial of a criminal case, `the code of ethics of the district attorney in all such matters cannot too closely follow the ethics of the bench.' `* * * A prosecutor should not act as a partisan eager to convict, but *202 as an officer of the court, whose duty it is to aid in arriving at the truth in every case.' * * * `His object, like that of the court, should be simply justice'; * * *. `"He is an officer of the state, * * * to see that the criminal laws of the state are honestly and impartially administered, * * * holding a position analogous to that of the judge who presides at the trial."' * * * The district attorney is not a mere legal attorney. `He is a sworn minister of justice.' * * * the district attorney who permits his zeal to secure convictions to cause him to disregard his duty as a `sworn minister of justice' not only wrongs the defendant, he impedes the administration of criminal justice and brings the administration of the criminal law into disrepute." O'Neill v. State, 189 Wis. 259, 207 N.W. 280 (Sup. Ct. Wis. 1926); that "the prosecuting attorney is a judicial officer, charged with the administration of justice. * * *" State ex rel. Freed v. Circuit Court, 214 Ind. 152, 14 N.E.2d 910 (Sup. Ct. Ind. 1938); that "prosecuting attorneys are constitutional state officers, * * * acting in a quasi-judicial capacity." Smith v. Page, 192 Ark. 342, 91 S.W.2d 281, 282 (Sup. Ct. Ark. 1936).
So too, as concerns the office of the Attorney General, it is the general rule that the character of the duties pertaining to this office are such as to call for the exercise of personal judgment based upon the facts and circumstances surrounding each particular occasion. 5 Am. Jur., Attorney General, Sec. 10.
And since the prosecutor is the direct inheritor of the prosecutive function, at least, of the Attorney General, as has been seen, the multitude of precedents judging the former to be a quasi-judicial office apply equally to that of the Attorney General.
As certain as it may be that the Attorney General and the prosecutor are quasi-judicial officers as such, some attention must be paid to the nature of the prosecutive function itself, for the State contends here that the instant statute enjoins in mandatory fashion the use of all lawful *203 and diligent means for the prosecutive ends of detection, arrest, indictment and conviction. It is quite true that the classification of duties as between judicial, or quasi-judicial, i.e., those of a judge (judex) and ministerial, i.e., those of a servant (minister) is sometimes difficult (Throop, Public Officers, Sec. 533, supra), and that whether an officer's duty is "discretionary" or "ministerial" must be determined by the nature of the act to be performed, and not by the office of the performer. Com. ex rel. Meredith v. Frost, 295 Ky. 137, 172 S.W.2d 905 (Ct. of App. Ky. 1943). The essence of discretionary power in this connection is that persons exercising it may choose which of several courses should be followed, and power to exercise honest discretion necessarily includes the power to make an honest mistake of judgment.
It cannot be doubted that even a quasi-judicial officer may have enjoined upon him ministerial duties, such as the filing of a report at stipulated intervals or the taking of fingerprints under specified circumstances, and the like. 52 L.R.A., n.s. 52. And since it is a general rule of the common law that willful neglect or failure of a public officer to perform any ministerial duty which by law he is required to perform is an indictable offense (Com. v. Coyle, 160 Pa. 36, 28 Atl. 576 [Sup. Ct. Pa. 1894]; 24 L.R.A. 522; 40 Am. St. Rep. 708; Donnelley v. United States, 276 U.S. 505, 48 S.Ct. 400, 72 L.Ed. 676, 48 S.Ct. 400 [U.S. Sup. Ct. 1927]; 2 Wharton, Criminal Law, 12th ed., Sec. 1894), there is little doubt that even a quasi-judicial officer would be so indictable. There must, therefore, be considered the nature of the duty imposed and in this connection it is evident that the duty imposed by the instant statute embraces or includes the prosecutive function. It enjoins the use of diligent and lawful effort for the accomplishments of steps in the prosecutive process. No one would suppose that the statute commands that an arrest be made other than for prosecution of the offender, as for instance, for the unworthy purpose of facilitating the questioning of a witness who is not intended to be prosecuted; or that it suggests indictment *204 other than for the purpose of prosecuting, as for instance, to terrify a potential witness into cooperation, or to satisfy some temporary public clamor, with no real intention of putting such indicted person to trial. In the province of the prosecutive function and duties appertaining thereto or a part thereof, I am quite certain that there are involved duties discretionary in nature. In 2 Thornton on Attorneys at Law, at page 1149, it is said that the Attorney General has power, both under the common law and by statute, to make any disposition of the state's litigation that he deems in its best interest. At common law, the Attorney General alone could discontinue with a criminal prosecution by entering a nolle prosequi thereon. 2 R.C.L. 913. And it has been held to be within the sound discretion of an Attorney General whether he would grant immunity from prosecution to an offender against the laws, under certain circumstances. State v. Finch, 128 Kan. 665, 280 Pac. 910, 66 A.L.R. 1369 (Sup. Ct. Kan. 1929).
It has been held that in the investigation of any alleged offense, in considering the facts on the question of prosecution or not, the district attorney acts in a quasi-judicial capacity and exercises a discretion (State v. Peterson, 195 Wis. 351, 218 N.W. 367 [Sup. Ct. Wis. 1928]); that "`the prosecuting attorney is a very responsible officer, * * * vested with personal discretion intrusted to him as a minister of justice, and not as a mere legal attorney. He is disqualified from becoming in any way entangled with private interests or grievances in any way connected with charges of crime. He is expected to be impartial in abstaining from prosecuting as well as prosecuting, and to guard the real interests of public justice in favor of all concerned. This discretion is official and personal * * *.'" Segars v. State, 94 Fla. 1128, 115 So. 537, 540 (Sup. Ct. Fla. 1927). It has been held that the duty to prosecute is discretionary and that while an act which a district attorney might by law be required to perform involving no special exercise of discretion "* * * could undoubtedly be required," a distinction had *205 to be observed with regard to the duty to prosecute crimes. County Law of New York, Sec. 200, specifies the duty of a district attorney to prosecute crimes within the county for which he is elected, but there it was held that this duty was one calling for the exercise of discretion, and that the general duty to prosecute all crimes, or the special duty to prosecute a particular crime may not be required or supervised by a court. Leone v. Fanelli, District Attorney, 194 N.Y. Misc. 826, 87 N.Y. Supp.2d 850 (Sup. Ct. N.Y. 1949). The discretion vested in a prosecuting attorney as to when and against whom a criminal proceeding should be instituted has been held to be both official and personal (McKittrich v. Wallach, 353 Mo. 312, 182 S.W.2d 313 [Sup. Ct. Mo. 1944]; 155 A.L.R. 1), and that dereliction of duty on the part of the prosecuting attorney in failing to institute criminal prosecutions is not established by the fact that he or some one else might in some instances have reached a different conclusion as to the advisability of doing so. The same case holds that the duty of the prosecuting attorney involves a good faith exercise of sound discretion in determining whether or not a criminal prosecution should be instituted, according to the dictates of his own judgment and conscience, uncontrolled by the judgment and conscience of any other person.
A prosecuting attorney has been held to be vested with a personal discretion as a minister of justice and not as a mere legal attorney. Engle v. Chipman, 51 Mich. 524, 16 N.W. 886 (Sup. Ct. Mich. 1883). And so it has been held that "a public prosecuting officer, in determining whether certain purported facts which have been brought to his attention justify the accusation and prosecution of a person believed to have committed an offense, acts in a quasi-judicial capacity * * *." Leong Yau v. Carden, 23 Hawaii 362 (Sup. Ct. Hawaii 1916).
In regard to the statute under discussion, it must be remembered that the controlling feature is the group of terminal acts required, i.e., detection, arrest, indictment and *206 conviction, and not the abstract manner of bringing these about, i.e., by the use of "all reasonable and lawful diligence." I do not mean by this that nonfeasance would exist for failure of arrest if lawful and reasonable diligence were used to accomplish same, for the law does not require the impossible. What is meant is that if the duty to arrest is determined to exist, depending upon a preliminary judgment as to probable cause therefor, then the use of diligence therein is, of course, required; but if the obligation of arrest is decided against in the use of that discretion, then the requirement that diligence be used is manifestly non-existent. In other words, the statute does not enjoin the use of diligence except for the attainment of the objectives of detection, arrest, indictment and conviction, and if it were otherwise construed, it would command a course of conduct so abysmally vague as to be constitutionally unsound.
It is judicially noticeable that in the everyday function of a prosecutor, he discards, or commences, or abandons prosecutions, all in the exercise of his sound discretion. The reasons may vary in countless respects.  A deserting father may be reunited with his family; the author of a small worthless check may have made restitution to a forgiving victim; a young soldier leaving for foreign duty may be accused of breaking a shop window on his last liberty; a material witness may be dead or unavailable; a parallel prosecution may have been undertaken by the federal district attorney; substantial sentences may have been imposed in another jurisdiction for a part of the series of offenses involved, deemed to satisfy the ends of justice; or, as is the case in all jurisdictions, not excepting Bergen County (State v. Edelman, 19 N.J. Super. 350 [App. Div. 1952]), an accomplice or co-conspirator may seem more desirable as a State witness than as a trial defendant. And decisions based upon these and a multitude of other reasons are unexceptionable if made in good faith; they are within the orbit of the discretion vested in the prosecutor, and this discretion *207 must exist and be used if justice is to be administered. Without it, the administration of justice would collapse.
I conclude that the office of the prosecutor, as is that of the Attorney General, is a quasi-judicial office, and that in all matters incident to the process of prosecution, and particularly in that area of the prosecutive function which requires him to decide for or against the institution thereof, he exercises, and must exercise, a discretion equivalent to a quasi-judicial decision or determination; that this quasi-judicial discretion embraces the statutory injunction expressed in R.S. 2:182-5, supra, the alleged nonfeasance in which underlies the present indictment.

CRIMINAL NONFEASANCE OF DISCRETIONARY DUTY ON THE PART OF A QUASI-JUDICIAL OFFICER.
As has been said, the prime attack upon the instant indictment rests in its failure to attribute the nonfeasance charged to a corrupt or evil motive. It charges the defendant with knowledge of events which it alleges invoked the duty to act, and this, arguendo, may be considered to charge the knowledge of the existence of the duty to act. It charges his nonperformance of duty was continuous, willful and unlawful. But assuming that these words do not, in any conceptual combination, amount to the allegation of a corrupt or evil motive, as will be dealt with later, it is clear that the indictment does not charge that his nonfeasance, in any of the instances alleged, was due to such motive. The question, then, is plain. May there be a criminally punishable nonfeasance in respect of duties discretionary and quasi-judicial in nature, absent a corrupt or evil motive for such nonperformance?
Judicial discretion is the option which a judge may exercise between the doing and not doing of a thing which cannot be demanded as an absolute legal right, guided by the spirit, principles and analogies of the law, and founded upon the reason and conscience of the judge, to a just result in *208 the light of the particular circumstances of the case. Amo v. Genovese, 17 N.J. Super. 109 (App. Div. 1951). As has been seen, a quasi-judicial discretion differs not in essence, but in the identity of the officer, or the particular type of function to be fulfilled. For the exercise of this type of discretion there manifestly must be freedom of conscience, although as has been noted, the discretion is not untrammelled, its objective being to give effect to the will of the law, and not the arbitrary will of the judge. Osborn v. U.S. Bank, 9 Wheat. 728, 6 L.Ed. 204 (1824).
In observing the vagaries of human conduct, one may suppose at the outset that if a motive is not corrupt, it is honest, if indeed there is a motive at all,  if reasoned conduct is assumed. Conceded an intent, it is either evil or good. Given a purpose, it is either "instigated by the Devil," as evil intent was called in the early law, or responsive to the normal good of the human impulse. Whatever the antithesis of corrupt motive may be, a deep legal chasm exists between these opposites. In the analysis of an act or omission to act, corrupt or evil motivation is certainly one thing in legal contemplation, and all other motives, or purposes, or negligences, or mistakes, or inefficiencies, or nonfeasances fall into the opposing category. And this exactitude of separation inclines one to the belief that there can be no lapping over of these elements; one can no more be partly corrupt than be partly dead. So that if the nonfeasances charged against the defendant were not of corrupt or evil motivation, they were something else, and it is this "something else" which is involved in this question. Hence the issue, in determining whether criminal acts are here charged, is whether the nonperformance of duty arising from other than corrupt motives, i.e., from the honest but poor use of discretion, from the mistakes of erroneous judgment, from the incapacity of an unqualified actor, from the outrage of continuous negligence, from the wrongness of policy determination, in other words, from the whole range of nonfeasance based on motives *209 other than those corrupt and evil, may be found to be criminal in nature.
Of course the law punishes conduct which is not evil in motive but grossly negligent, or of like reprehensibility, for instance, in various categories of crime including manslaughter, the causing of death by automobile and many others. But in determining whether a quasi-judicial officer such as a prosecutor may be held criminally liable for nonfeasance in the absence of a corrupt motive, I think the answer must be found in a consideration of why that discretion exists, what it is for, what it means to the law and to justice. In this connection, fruitful attention may be given to the extraordinary measures taken by the law to preserve such discretion, to facilitate its unhampered use, and to view it as a living and breathing organism in the body of the law. Thus, it has made it immune from civil litigation.
The United States Supreme Court has expressed, in the case of a civil suit against a judge, a rule equally apt here:
"It is a general principle of the highest importance to the administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." Bradley v. Fisher, 13 Wall. 335, 20 L.Ed. 646 (1871).
The overtones of judicial thought throughout the years have stressed the superior public interest in freeing judicial and quasi-judicial officers from fear of any kind within the orbit of the exercise of their honest judgment. "To allow a judge to be sued in a civil action on a complaint charging the judge's acts were the result of partiality, or malice or corruption, would deprive the judges of the protection which is regarded as essential to judicial independence. It is not in the public interests that such a suit should be maintained; and it is a fundamental principle of English and American jurisdiction that such an action cannot be maintained." Yaselli v. Goff, 12 F.2d 396, 399, 56 A.L.R. 239 (2 C.C.A. 1926), affirmed 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395.
*210 This doctrine of immunity has a "deep root in the common law" (Yates v. Lansing, 5 Johnson 291 [Sup. Ct. N.Y. 1810]); it is imbedded in our jurisprudence. (Alzua v. Johnson, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142, 34 S.Ct. 27 [U.S. Sup. Ct. 1913]). In Fray v. Blackburn, 3 B&S 576 (Queen's Bench 1863), the historical course of the decisions from very early times is evident, and the rule justified as follows: "It is a principle of our law that no action will lie against a Judge of one of the superior Courts for a judicial act, though it be alleged to have been done maliciously and corruptly; * * * The public are deeply interested in this rule which, indeed, exists for their benefit, and was established in order to secure the independence of the Judges, and prevent their being harassed by vexatious actions."
Lord Coke said of the judges that "they are only to make an account to God and the King," for other sanctions "would tend to the scandal and subversion of all justice." 12 Coke 25. In like vein, attributing to the State alone the power of retribution for unfaithful or dishonest discharge or neglect of official duty, Judge Cooley said:
"Wherever, therefore, the state confers judicial powers upon an individual, it confers them with full immunity from private suits. In effect, the state says to the officer that these duties are confided to his judgment; that he is to exercise his judgment fully, freely, and without favor, and he may exercise it without fear; that the duties concern individuals, but they concern more especially the welfare of the state, and the peace and happiness of society; that if he shall fail in the faithful discharge of them he shall be called to account as a criminal, but that in order that he may not be annoyed, disturbed and impeded in the performance of these high functions, a dissatisfied individual shall not be suffered to call in question his official action in a suit for damages. That is what the state, speaking by the mouth of common law, says to the judicial officer. The rule thus laid down applies to large classes of offices * * *. It applies to the highest judge in the state and nation, but it also applies to the lowest officer who sits as a court * * *." 2 Cooley, Torts, 3rd ed., p. 795.
And so it has been said that "it is indispensable to the administration of justice that a judge or other judicial *211 officer, who acts within the scope of his jurisdiction, may act freely, without any fear of being held responsible in a civil action, or having his motives brought in question by one injuriously affected by his judgments. * * * If the officer be in fact corrupt, the public has its remedy * * *." (Curnow v. Kessler, 110 Mich. 10, 67 N.W. 982, 984 [Sup. Ct. Mich. 1896]); and that, "whenever duties of a judicial nature are imposed upon a public officer, the due execution of which depends upon his own judgment, he is exempt from all responsibility by action for the motives which influence him and the manner in which said duties are performed. If corrupt, he may be impeached or indicted, but he cannot be prosecuted by an individual for the wrong which may have been done." State v. Henning, 33 Ind. 189 (Sup. Ct. Ind. 1870); Kittler v. Kelsch, 56 N.D. 227, 216 N.W. 898, 56 A.L.R. 1217 (Sup. Ct. N.D. 1927).
The policy of the law, then, for the preservation of justice obtainable only by the free use of discretion, suppresses the remedy for private wrongs, but it does not place the judge above the law itself. Mr. Justice Brewer, sitting at circuit, expressed this reassuring doctrine in Cooke v. Bangs, 31 Fed. 640, 642 (Cir. Ct. Dist. Minn. 1887), when he said of the judge:
"Again, he is just as amenable to the criminal law as any private citizen. There is no judge, from the judge of the Supreme Court of the United States at Washington, to a justice of the peace in the smallest township of the state, who, acting on any judicial matter from corruption or from malice, but becomes amenable to the criminal law the same as any other man, and may also be removed from office by proper proceedings. So there is no danger of judges as a class feeling that they are above the law, or becoming independent of the law, or indifferent to the rights of others."
The same reasons of private interest and public policy which operate to render the judicial officer exempt from civil liability for his judicial acts within his jurisdiction apply equally as well to the quasi-judicial officer. Newell Malicious Prosecution, Sec. 68. Such immunity extends to jurors for the same purpose, namely, of preserving their *212 independence and freedom of judgment. 1 Hawkins Pleas of the Crown 349; 17 Eng. and Am. Encyc. of Law 1302; 38 C.J.S. Grand Juries, § 47, p. 1065. For again, as Lord Coke says, "they inquire for the King and their service was for the King and the commonwealth, and only he could call them to account." 12 Coke 23.
The reasons for granting immunity to judges, jurors, attorneys and executive officers of government exercising quasi-judicial functions, apply with equal force to a public prosecutor in the duties which rest upon him, and he is likewise immune, for the sake of the free exercise of his discretion. Yaselli v. Goff, supra; Smith v. Parman, 101 Kan. 115, 165 Pac. 663, L.R.A. 1917 F. 698 (Sup. Ct. Kan. 1917); Griffith v. Slinkard, 146 Ind. 117, 44 N.E. 1001 (Sup. Ct. Ind. 1896); Watts v. Gerking, 111 Oreg. 641, 222 Pac. 318, 228 P. 135, 34 A.L.R. 1489 (Sup. Ct. Oreg. 1924); Edelman v. Dunn, supra.
The sole purpose of the grant of this extraordinary immunity from civil suit is the consequent freedom in the use of discretion required of a quasi-judicial officer, or as once said by our former Justice Ackerson, "* * * the ground on which the foregoing rule of privilege rests is that, if such an action as this would lie, all officers exercising judicial functions would lose their independence, and that the absolute freedom of such officers is necessary for the proper administration of justice. This freedom of action is given by law to such officers, not for their own sake but for the sake of the public, and for the advancement of justice; that being free from civil liability they may be free in thought and independent in judgment as all who are called upon to administer justice ought to be." O'Regan v. Schermerhorn, 25 N.J. Misc. 1 (Sup. Ct. 1946). Of such immunity it has been said "It is a principle which lies at the very foundation of a free, vigorous and independent administration of justice. It may be traced from the earliest periods of our juridical history down to the present day. * * * Indeed, were we to subject the judges of the established courts of justice to *213 private prosecutions whenever the passions or resentments of disappointed suitors might dictate that measure, we should subdue their independence and destroy their authority." (Little v. Moore, 4 N.J.L. 82, 84 [Sup. Ct. 1818]); and in Taylor v. Doremus, 16 N.J.L. 473 (Sup. Ct. 1838), Chief Justice Hornblower said "an action will not lie against a judge for an error in judgment, however prejudicial to the rights of the party such error may be, is a proposition so plain, so consonant to reason, and so essential to the very existence of courts of justice, that it needs neither authority nor argument to support it," and that "The judicial errors of a justice must be corrected by an appeal or writ of certiorari; but his judicial corruption, by the court of impeachments."
The question then arises whether this independent use of judgment and discretion could survive the constant threat of criminal sanctions based not on corrupt or evil nonfeasance, but on mere negligence, mistake or other non-corrupt, albeit intentional, departure from duty. There is authority for the negative of this proposition. In 1 Burdick, Law of Crime, 390, Sec. 272a, we read "Official misconduct ranges all the way from willful wrongdoing to neglect of duty. Where, however, a duty is not absolute, but is discretionary with an officer whether to perform it or not, then its omission is not in itself indictable."; or, as stated in 43 Am. Jur. 91, Sec. 278, "On the other hand, failure to perform discretionary and quasi-judicial powers does not in general subject an officer to personal liability so long as he is acting within the scope of his authority or jurisdiction."; and again, "where, however, the duty which has not been performed is one involving discretion, the failure to perform it is not per se an indictable offense in the absence of willful and corrupt motives." Of justices of the peace, it was said in People v. Coon, 15 Wend. 277 (Sup. Ct. N.Y. 1836) that "whenever they act partially or oppressively from a malicious or corrupt motive, they may be punished criminally." In King v. Justices of Seaford, 1 Black W. 432, 96 Eng. Rep. *214 246 (1828), the court said "* * * it must be a very strong case indeed, with flagrant proofs of their having acted from corrupt motives, that would warrant a rule for an information * * *."
So it has been held that "when a public law imposes a public duty upon a single person or a number of persons, the omission to perform the duty is indictable, but if it is not an absolute duty, but a conditional one, dependent upon the honest exercise of the judgment of the body to whom it is entrusted whether it is to be performed or not, the omission to perform it, per se, is not an indictable offense. State v. Williams, 34 N.C. 172 (Sup. Ct. N.C. 1851). Our Supreme Court in State v. Kern, 51 N.J.L. 259 (Sup. Ct. 1889) said of a public officer, "He will not be liable for mere errors of judgment, but a willful and corrupt awarding of a contract for such work, * * * would be a neglect and breach of duty such as to constitute official misbehavior, indictable at common law." Similarly in discussing the quasi-judicial duties of a licensing body, it held that if its members act in willful, intentional and corrupt disregard of the known law and known facts, they are indictable and, consequently, that "an indictment will therefore lie against such commissioners who grant or refuse such a license from corrupt and improper motives. State v. Sweeten, 83 N.J.L. 364 (Sup. Ct. 1912).
In State v. Wheatley, 192 Md. 44, 63 A.2d 644 (Ct. App. Md. 1949), it was held that an individual serving in a judicial capacity, in which he is required to exercise his own judgment, is not indictable for mere error of judgment or for a mistake of the law; his act, to be cognizable criminally must be willful and corrupt. 1 Bishop Criminal Law, 9th ed., Sec. 460. So too, in Com. v. Hubbs, 137 Pa. Super. 244, 8 A.2d 618, 620 (Super. Ct. Pa. 1939), it was held that where the nature of the duty is such as to permit the exercise of discretion, there must be present the additional element of an evil or corrupt design to warrant criminal conviction for misbehavior in office and this for the reason that "public *215 officers are not to be hampered in the performance of discretionary duties by the fear of criminal prosecution for an error of judgment committed in good faith." The defense here stresses the similarity of the Hubbs case, supra, and particularly the adoption by the appellate court of this excerpt of the trial court's opinion:
"Counts 1 and 3 charge willful failure, but do not charge fraud, dishonesty or corruption. It is obvious that the Superintendent of Police must have vested in him some discretion in the performance of his duties. He may suspect that a person is violating the laws against gambling and yet it may be wise to postpone a raid or an arrest until more evidence is secured, or until other persons concerned may be apprehended. He must work largely through subordinates and it may well be that all police matters cannot be given immediate attention. He may have to decide whether to use his men at a certain time for the suppression of gambling, or for the solution of a murder or for the suppression of a riot. If he used his men for other purposes at a certain time, even though he acted in perfect good faith, it would be true that, as the indictment charges, he `did willfully omit, neglect and refuse to cause the laws of the Commonwealth prohibiting the maintenance * * * of gambling houses * * * to be executed and enforced.' Had he used his men in a concerted drive against gambling, he might with equal justice be charged with failing to enforce the law against murder, or riot or some other crime. Obviously this is a case where there can be no crime unless the motive be bad, and all counts of the indictment are insufficient because there is no charge of fraud, dishonesty or corruption."
In support of its proposal that criminal nonfeasance of duty of the prosecutor may exist absent a corrupt or evil motive, the State here relies heavily on two prominent cases, each involving convictions of prosecutors for misconduct in office, namely, State v. Jefferson, 88 N.J.L. 447 (Sup. Ct. 1916), affirmed 90 N.J.L. 507 (E. & A. 1917), and State v. Bolithe, 103 N.J.L. 246 (Sup. Ct. 1926), affirmed 104 N.J.L. 446 (E. & A. 1927). It is urged that the Jefferson case supports the proposition in the use of the following language by the Supreme Court:
"Such an (corrupt) agreement (not to prosecute) was not, however, of the essence of the offense of malfeasance * * *. Indeed such an agreement, or even such payments or receipts of money were *216 not essential to the offense of malfeasance, which without doubt might be as fully committed for reasons of personal favoritism or for political reasons or for no known reason at all."
The State points to this as a declaration that nonfeasance committed for no known reason at all, in relation to a discretionary duty, is criminally punishable. It must first be understood that the term corrupt or evil motive has never been confined to financial corruption, but may exist in other circumstances such as oppression, personal interest, or the like. Rex v. Brooke, 2 T.R. Eng. 190 (King's Bench 1788); Rex v. Williams, 3 Burr. 1317, 97 Eng. Reprint 851 (King's Bench 1762). State v. Sweeten, supra. Evilness of motive could, of course, be based upon personal favoritism, or upon political reasons, or upon other unworthy elements separate and apart from the merits of the issue and the facts, and an honest though mistaken exercise of discretion. As to the comment that malfeasance might be committed without a corrupt agreement, that, too, is consonant with its nature, since the motive may be evil without a specific or even a tacit agreement to do the wrongful act. But malfeasance in its nature as distinguished from nonfeasance of a ministerial duty at least, is the wrongful or unjust doing of some act which the doer has no right to perform (Fuson v. Com., 241 Ky. 481, 44 S.W.2d 578 [Ct. App. Ky. 1931]; Com. v. Wood, 116 Ky. 748, 76 S.W. 842 [Ct. App. Ky. 1903]; Bishop, New Criminal Law, 972; State v. Seitz, 1 Terry 572, 14 A.2d 710 [Ct. Gen. Sess. Del. 1940]) and it has been held that like nonfeasance, it cannot be charged against a public officer except for breach of a positive statutory duty, or the performance of a discretionary act with an improper or corrupt motive. Com. v. Macleary, 147 Pa. Super. 9, 23 A.2d 224 (Super. Ct. Pa. 1941).
In any case, I am inclined to think that the latter assertion by the learned court, "for no known reason at all," must be considered dicta, for the Jefferson case was one of official corruption in all its aspects. The indictment charged corruption *217 and was so viewed by the learned trial judge who charged that the indictment "endorsed itself as an indictment for malfeasance, which in plain everyday language means corrupt action on the part of a public official"; that, "before the jury can convict * * * they must find that the acts charged against him were corruptly done"; that, "every count in the indictment is based upon a charge of wrongful intent and therefore the jury must find such wrongful intent before they can convict"; that if "you take up this indictment * * * you will find that it alleges that there were corrupt transactions upon the part of the defendant * * *," and so on. The proof of corruption was plenary. Vol. 772, Ct. Errors & Appeals Briefs (1919). And the Supreme Court so recognized it in its opinion saying that "The detailed testimony as to these transactions afforded ample ground for the jury to find that the failure to prosecute was the result of a corrupt agreement * * *." Consequently, there is complete dissimilarity as between this case and the issue under discussion.
So too, in the Bolitho case, the State refers to one portion of the court's charge, as defining the crime of malfeasance:
"Further, that the defendant, being a public officer, in order to convict, you must find from the evidence beyond a reasonable doubt that he willfully refused or neglected to perform some duty imposed upon him by law within the time required by law. In order to constitute the offense under our statute, it is necessary that the failure or neglect to perform the duty imposed by law be willful; it must be a refusal or neglect to perform within the time required by law."
But closer scrutiny of the case itself evidences that in the above language the court was not attempting to define all the elements of malfeasance, but stressed one necessary element therein, that of willfulness. Here, too, was a clear case of corruption in office. The five counts of the indictment on which the defendant was convicted charged actual corruption and bribery, and abandonment of duty with such motivation. So the late Justice Parker viewed the indictment in his charge:
*218 "You see what a tremendous power for good or evil is placed in the hands of one man by the statute, and how important it is that the man selected to perform the duties of this responsible office should be one who can be depended on to perform them honestly and fearlessly. Now, the claim in this case is that this man did not do that thing; and the various counts of the indictment (perhaps not all of them, but certainly some of them) are to the effect that, instead of doing the duties of his office, instead of prosecuting cases of crime, he prostituted that office and accepted bribes to let the criminals either go scot free or to let them off with less punishment than they deserved. That is the general spirit of this indictment, as far as I can see."
Justice Parker also thought, as mentioned in his charge, that the counts of the indictment charged "what really amounts to a criminal conspiracy between the Prosecutor and the other parties to obstruct and defeat the processes of justice, * * *." Vol. 1039, Ct. Errors & Appeals Briefs (1927).
The Bolitho case, then, does not offset the rule supported by the weight of authority. The upholding of that rule seems so essential to the administration of justice, particularly as it applies to the exercise of quasi-judicial discretion lodged in the prosecutor, that I am satisfied it must be the true rule.
I conclude that for a prosecutor's nonfeasance in the exercise of the quasi-judicial and discretionary duties of his office respecting the prosecutive function and including the obligations laid upon him by R.S. 2:182-5, supra, to amount to criminal nonfeasance or misconduct in office, such nonfeasance must be based upon some corrupt or evil motive.

THE INDICTMENT IS INVALID
The regrettable length of this opinion does not permit me to discuss certain points of attack, including the alleged insufficiency of charge of crimes basic to the nonfeasance, and the alleged duplicity of the indictment, and in any case I find treatment of these grounds unnecessary to decision. In its brief, the State refers to R.S. 2:160-1, which provides *219 that "Any magistrate or other public officer who shall willfully refuse or neglect to perform, within the time required by law, any duty imposed upon him by law, shall be guilty of a misdemeanor." This statute, which is declaratory of the common law, unquestionably must refer to the performance of duties mandatory and ministerial in nature, for the opposite construction contended for by the State "would be so detrimental to the public interest that we cannot believe that the Legislature intended so absurd a result." State v. Brattrud, 210 Minn. 214, 297 N.W. 713, 715, 134 A.L.R. 1248 (Sup. Ct. Minn. 1941); State v. Boyd, 196 Mo. 52, 94 S.W. 536 (Sup. Ct. Mo. 1905); People v. Brooks, 1 Denio 457, 43 Am. Dec. 704 (Sup. Ct. N.Y. 1845).
There remains the question as to whether the words "wilfully, continuously and unlawfully," taken in the light of the defendant's alleged knowledge of the crimes being committed, may be construed to afford by implication the element of corruption or evilness of purpose. The word "unlawfully" does not aid the indictment for it is merely a conclusion of law, and has nothing to do with the intent with which an act is done, but merely concludes that the act so done falls into the category of unlawfulness. State v. Riggs, 91 N.J.L. 456 (Sup. Ct. 1918); State v. DeVita, supra. The word "wilfully" means intentionally or voluntarily. (State v. Scott, 104 N.J.L. 544 [E. & A. 1928]) and this adverbial reference to the character of the act does not furnish the allegation of corrupt intent which we have seen is necessary. State v. Gardner, 2 Mo. 23 (Sup. Ct. Mo. 1828); Com. v. Hubbs, supra. The word "continuously," of course, adds nothing of logical compulsion to the essence of corrupt intent, but only the trappings of suspicion, which are not sufficient. An indictment which fails to charge the essential mental ingredient for the specific crime, whether it be knowledge, intent, falsity or corruption, does not charge a crime. State v. Wheatley, supra; State v. DeVita, supra.
And the indictment is more fundamentally uncertain. The duty of defendant is charged in the words of the statute as *220 amplified by synonymous or reasonably cognate language, and is reduced to specific application to the particular gambling crimes charged to have existed, and this would appear sufficient to plead the source and existence of duty. State v. Donovan, 132 N.J.L. 319 (Sup. Ct. 1945). With respect to the alleged breach of duty, however, the indictment seems naked and uninformative, for it alleges merely the failure to take and pursue all legal, effective and diligent means at hand for the "detection, arrest, indictment and conviction" of those unidentified offenders against the law implicated in such gambling offenses, and by so doing to "suffer and permit gambling in the manner and form aforesaid." The latter point, of course, must be limited to the role of cause and effect, for this indictment does not suggest that the defendant "suffered and permitted gambling" by any other means, such as by a corrupt arrangement with those who would commit such crimes, but only by a failure to detect, arrest, indict and convict those responsible therefor. Hence, if legal or explanatory verbiage is discarded, it is apparent that the delineation of the nonfeasance is to be found solely in the alleged failure to use all reasonable or lawful diligence or means for the accomplishment of these persecutive goals, i.e., detection, arrest, indictment and conviction of the offenders. How this diligence could or should have been exercised, or what means defendant failed to use for the attainment of these purposes, is not indicated. There remains in a very limbo of uncertainty the question as to whether the alleged nonfeasance was whole or partial; whether duty had been pursued at all and then abandoned, or had never been embarked upon; whether the persecutive steps taken were inadequate in scope, or efficiency, or culminant effectiveness, or whether persecutive or police steps were taken at all. Needless to say, many avenues of effort are open to the diligent prosecutor in the detection of crime and the arrest, indictment and conviction of criminals. Such a prosecutor might investigate by his office personnel, bypassing local police authorities suspected of corruption; he *221 might hale before the grand jury the record owners of the homes involved, or other witnesses; he might urge the court to charge a grand jury to greater efforts; he might offer his assistance to local police authorities; he might seek information from the Federal Bureau of Investigation or other agencies; he might organize conferences of police chiefs for discussion of the problems of law enforcement; he might, in extreme need, ask the Legislature for more stringent laws as to gambling, or search and seizure, or subpoena powers, or the like: he might call upon the State Police for assistance (R.S. 53:2-1); he might be content to pass on his information as to crime to the chief executive or police chief of the municipality involved, by the written communication referred to in R.S. 2:178-8, now N.J.S. 2A:152-12, thereby placing specific responsibility on these officials; or, he might call upon the Attorney General for aid as contemplated by R.S. 52:17A-4(f), supra.
It is obvious that all of these expedients and countless other means and measures which are available to a prosecutor would comprise steps in the use of "all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." In the face of this indictment one must ponder in vain as to whether the defendant is charged with having failed to take any of such steps, or whether, having taken some, the Grand Jury believed that he ought, in the use of reasonable and lawful diligence, have pursued other or different measures.
An indictment is not sufficient which condemns an "attitude" of nonfeasance. State v. Jenkins, 136 N.J.L. 112 (Sup. Ct. 1947). There must be allegations of specific nonfeasance. And where there is charged an abandonment of duty, there must be shown with reasonable certainty in what that abandonment of duty consisted. Thus, in State v. McFeeley, supra, relied on heavily here by the State, we read (in a setting in which defendant police officials had already raided a gambling house, had arrested culprits and had seized implements of gambling) of "criminal complaints un-instigated, *222 unmade, and unfiled," of "gambling paraphernalia not destroyed but returned to the owner," and of "official reports and memoranda being permitted to disappear" from defendants' custody. So in the indictment of State v. Preiskel, 13 N.J. Misc. 736 (Sup. Ct. 1935), there is charged the neglect of police officials "to inquire into gambling crimes, and into the neglect and omission of subordinate police officers to pursue their duty in failing to suppress the same." (Vol. 1420, Ct. Errors & Appeals Briefs [1936]); and in State v. Walter, 14 N.J. Misc. 547 (Sup. Ct. 1936) of a corrupt compact to permit gambling and other crimes. (Vol. 1439, Ct. Errors & Appeals Briefs (1936). These are specifications of dereliction of duty (on the part, too, of police officials under the mandatory duty to suppress crime, and not vested with discretion as to prosecution. State v. McFeeley, supra), which are absent in the present indictment.
I believe that this indictment does not meet the constitutional requirement of informing defendant of the "nature and cause of the accusation" and that it does not charge the offense with the certainty required of indictments. Thus it has been said that "Unless the charge contain a description of the crime of which the grand jury accuses the defendant, and a statement of some circumstances by which it may be identified, and its particular nature disclosed, it is readily conceivable that a true bill may be found for one offense, and the defendant be compelled at the trial to meet any offense that happens to fall within the general terms of the indictment." State v. Schmid, 57 N.J.L. 625 (Sup. Ct. 1895). This case dealt with a general allegation of unlawful sale of liquor, couched merely in the words of the statute, and the court thought it essential that it be more informative, for instance, that it should distinguish between sales on Sunday and sales to an habitual drunkard, or the like, and that otherwise it could not see "how a defendant indicted in this vague fashion could either plead or prepare for trial." State v. Spear, 63 N.J.L. 179 (Sup. Ct. 1899); State v. Morano, 134 N.J.L. 295 (E. & A. *223 1946); State v. Ellenstein, 121 N.J.L. 304 (Sup. Ct. 1938). Rule 2:4-11 provides "the indictment or accusation shall be a written statement of the essential facts constituting the offense charged * * *."
With respect to the type of crime charged here, former Chief Justice Case said:
"* * * A defendant is unable to plead or to prepare a defense against such proofs unless he knows in advance the particular offense or offenses counted upon; not merely the general definition of the crime, either in the words of the statute or according to the common law, but such details of the act or omission as will enable him to know precisely what accusation is laid against him and to prepare his case with foreknowledge of what he will be called upon to meet." State v. Jenkins, supra; State v. Daly, 3 N.J. Super. 247 (App. Div. 1949).
The indictment under consideration does not meet these tests and, in my opinion, is fatally uncertain. State v. DeVita, supra.
But there is a superior reason, if that be possible, requiring the dismissal of this indictment. I have referred to the essential relationship between the administration of justice and the free exercise of the quasi-judicial discretion of a prosecutor. A prosecutor is bound to a higher duty than the advocacy of his cause. He is a symbol of justice. He is committed to a professionalism which would bind him, for instance, to a disclosure of facts in the very midst of trial of his case which might well bring about its collapse, all in the name of justice. State v. Longo, supra. In his role as a minister of justice, he must be single-minded in purpose. "`His object, like that of the court, should be simply justice.'" O'Neill v. State, supra, [189 Wis. 259, 207 N.W. 281]. There must be no impediment to the performance of this high duty. If this stream of justice be diluted, it must stagnate.
Should the theory of the instant indictment be upheld, a very grievous blow would be dealt the administration of justice, for no prosecutor could remain fearless and independent *224 in the performance of duty. Every action of a prosecutor henceforth would be sullied by self-interest; every decision for or against prosecution, or as to the means or methods thereof, would involve two elements,  first the requirements of justice, and second the personal, political and professional welfare of the prosecutor himself. Man inclines toward self-preservation, and the element of the prosecutor's own safety, foreign as it is to his duty, irrelevant as it is to the doing of justice, would soon become the first thing to be considered. Neither case of conscience, nor a sense of personal honesty, nor his secure knowledge of the probity of his own acts, would relieve him of the lurking fear of indictment and disgrace. He thus, in a very real sense, would have a personal object, his on safety, in his every official act, and his every decision would be tainted with this self-interest, and, correspondingly, destructive of justice.
Such a prosecutor no longer would do what he believed to be right, but what he believed would not offend the public, or a grand jury, or one who might supersede him in office. He would dispense justice if it did not entail any risk to himself. The law and his own conscience would no longer be his guide stars, but he would be directed by less worthy incentives.
And so the course of justice in our State would be polluted in its administration by a body of cringing and faceless prosecutors, who would no longer fulfill their ancient mission as ministers of justice, but would prostitute justice in their own self-interest and turn their backs on what is right in favor of what is expedient and popular. Such prosecutors, understandably enough, would resolve every doubt in favor of prosecution, and there would be such a surfeit of petty and baseless prosecutions as to sicken the mind of one who had belief in the grandeur and the probity of the administration of public justice.
I do not consider here the basic rights and wrongs of events which may have occurred in Bergen County. I consider the validity of the present indictment. As to the defendant prosecutor, *225 he, as Lord Coke says, "renders his account to God and the King," i.e., to the State. The portion of this reckoning which is justiciable in a human tribunal is the sole question before me and I am clear that such responsibility, in the sense of punishment as a crime, does not exist in the absence of corruption or evilness of motive.

CONCLUSION.
This decision does not mean that the State lies helpless in the face of official astigmatism such as described in this indictment. Constitutional and statutory remedies lie ready to its hand to rid itself of ministers of justice who fail in their stewardship; in fact, the maintenance of the public order and peace in Bergen County is even now in the charge of the Attorney General of the State. There is no county in the State where there cannot be found twenty-three citizens of the type which comprised the Special Grand Jury in Bergen County. The State is not defenseless.
The people of this State are not idiots. They do not need to be expert in the niceties of the common law to realize the vast power of the county prosecutor and the capacity his office affords for moral leadership in the field of law enforcement. They sense intuitively the respect which his office can engender in police circles, and his obligation to be zealous in this field in the pursuit of public justice. The people do not expect their "minister of justice" to be a witch hunter, or to pour out the resources of his effort by investigating grammar school picnics to learn whether some one is selling "chances" on a chocolate cake. But on the other hand, they realize that syndicated crime in the field of gambling spawns and nourishes official corruption. By television and other modern communications, and in the press, as well as in Grand Jury rooms, the people have finally had a look at the scoundrels who have presided at the tawdry feast of politics and crime, of official corruption and graft. They have emerged from the coma of complacency of the two post-war periods which our *226 generation has seen, and have become more sophisticated. They know what is meant in underworld parlance when a community is said to be "wide open" or "closed up tight," and are aware that these conditions are responsive to the attitude of those charged with enforcement of the law. I am sure the public is unconvinced by breast thumping that widespread syndicated crime can exist notoriously and corrupt the law enforcement machinery of our communities, and the State remain powerless.
The contrariety of individual opinions as to the moral aspects of gambling resolves itself to a common denominator in objection to the monstrous official corruption which it breeds. It is evident that there is a common dedication of law-abiding citizens to the destruction of the Frankenstein of official corruption.
Whatever may be the true extent of the prosecutor's common law powers in the police field, there is the undeniable moral obligation to use all his resources to destroy official corruption which causes a breakdown of enforcement at the local level. The State may enforce this obligation, but it must do so by law, and in our system, even a justifiable public clamor can never validate an indictment which does not, in law, charge a crime.
The indictment is dismissed.
NOTES
[1] Report of the American Bar Association Commission on Organized Crime; Vol. 76 Reports A.B.A., p. 385.
[2] "Assaults, * * *, and all other offenses of an indictable nature at common law, and not otherwise expressly provided for by statute, are misdemeanors." R.S. 2:103-1, now N.J.S. 2A:85-1.
[3] "2. That the said Walter G. Winne, as such Prosecutor of Bergen County, during all of said time, was charged, among other things, with the public duty of using and exercising all proper, reasonable and effective means and all lawful means within his power, and diligence for the detection, arrest, indictment and conviction of offenders against the laws in accordance with the Revised Statutes of New Jersey 2:182-5."
[4] "5. That on or about the tenth day of December, 1947, and from thence continuously to and including the first day of December, 1950, and on divers other dates and times, in the Borough of Fort Lee, in the said County of Bergen, there were kept and maintained at premises known and designated as 2075 Lemoine Avenue, certain gaming and betting houses wherein gambling was conducted by means of dice games, so called; and in the said Borough of Fort Lee gaming by means of instruments, engines, apparatus and devices having figures and numbers thereon, were used and employed and conducted; and in the said Borough of Fort Lee furniture and implements used for the playing of unlawful games were kept, stored and possessed, all in violation of the laws of this State, and all of which he, the said Walter G. Winne, public officer as aforesaid, then and there well knew.

6. That, nevertheless, the said Walter G. Winne, being such public officer aforesaid, and well knowing the premises aforesaid, but disregarding the public duties so by law so enjoined upon him, as aforesaid, then and there continuously, unlawfully and willfully did neglect and omit to perform the said public duties so enjoined upon him; and then and there continuously, unlawfully and willfully did neglect, fail and omit to use and exercise, and cause to be used and exercised, all proper, reasonable, effective and diligent means and all lawful means within his power as Prosecutor of Bergen County, for the detection, arrest, indictment and conviction of a person or persons who kept and maintained the gaming house as aforesaid, wherein the practice of maintaining a resort to which persons might come for an illegal purpose, namely, for the purpose of playing at dice; and wherein the laws of this State concerning gambling were violated in the manner and form aforesaid, but, on the contrary, then and there unlawfully did suffer and permit gambling in the manner and form aforesaid, to wit, that he, the said Walter G. Winne, continuously, unlawfully and willfully did neglect and omit to perform the said public duties so enjoined upon him by using and exercising all proper, reasonable and effective means and all lawful means within his power, and diligence for the detection, arrest, indictment and conviction of offenders against the law, contrary to the form of the Revised Statute 2:103-1, and against the peace of this State, the government and dignity of the same."
[5] "4. That on or about the second day of September, 1948, the said Walter G. Winne, as Prosecutor of Bergen County, did receive a complaint charging that one Henry Wysock, who was then a member of the Borough of Rutherford Police Department, in the said County of Bergen, was a corrupt public official, so called, in violation of the laws of this State.

5. That, nevertheless, the said Walter G. Winne, being such public officer and Prosecutor of Bergen County aforesaid, and well knowing the said Henry Wysock, who was then a member of the Borough of Rutherford Police Department, but disregarding the public duties so by law so enjoined upon him, as aforesaid, then and there continuously, unlawfully and willfully did neglect and omit to perform the said public duties so enjoined upon him; and then and there continuously, unlawfully and willfully did neglect, fail and omit to use and exercise, and cause to be used and exercised, all proper, reasonable, effective and diligent means and all lawful means within his power as Prosecutor of Bergen County for the detection, arrest, indictment and conviction of the said Henry Wysock; and wherein the laws of this State concerning corruption were allegedly being violated in the manner and form aforesaid, but, on the contrary, then and there unlawfully did suffer and permit the said Henry Wysock to continue in public office, to wit, that he, the said Walter G. Winne, continuously, unlawfully and willfully did neglect and omit to perform the said public duties so enjoined upon him by using and exercising all proper, reasonable and effective means and all lawful means within his power, and diligence for the detection, arrest, indictment and conviction of offenders against the law, contrary to the form of the Revised Statute 2:103-1, and against the peace of this State, the government and dignity of the same."
[6] "* * * it is generally held that the attorney general, in addition to the powers and duties conferred and imposed upon him by statute, is clothed and charged with all the common-law powers and duties pertaining to his office as well, except in so far as they have been expressly restricted. The duties of the office are so numerous and varied that it has not been the policy of the state legislatures to attempt specifically to enumerate them"; 5 Am. Jur., Attorney General, Sec. 6.